JANE HOPE et al., on Behalf of Themselves and All Others Similarly Situated, et al., Respondents, v CESAR PERALES, as Commissioner of the New York State Department of Social Services, et al., Appellants, and ST. VINCENT'S HOSPITAL AND MEDICAL CENTER OF NEW YORK et al., Proposed Intervenors-Appellants.

JANE HOPE et al., on Behalf of Themselves and All Others Similarly Situated, et al., Respondents, v CESAR PERALES, as Commissioner of the New York State Department of Social Services, et al., Appellants, and ST. VINCENT'S HOSPITAL AND MEDICAL CENTER OF NEW YORK et al., Proposed Intervenors-Appellants.

First Department, March 23, 1993

288

## APPEARANCES OF COUNSEL

*Donna Costa* of counsel *(Deborah M. Buell, Samantha D. Malloy, Ayala Deutsch, Stephanie Cotsirilos, Catherine Weiss, Donna Lieberman, Robert M. Levy, Janet Benshoof* and *Laurie R. Rockett* with her on the brief; *Cleary, Gottlieb, Steen & Hamilton; New York Civil Liberties Union Foundation; American Civil Liberties Union Foundation* and *Hollyer, Brady, Smith, Troxell Barrett, Rockett & Hines,* attorneys), for respondents.

*Judy Nathan* of counsel *(Jerry Boone, Howard L. Zwickel* and *Carol S. Knox* with her on the brief; *Robert Abrams, Attorney-General,* attorney), for appellants.

*Michael L. Costello* of counsel *(Tobin & Dempf,* attorneys), for St. Vincent's Hospital and Medical Center of New York and others, proposed intervenors-appellants.

*Michael P. Tierney* for Alma Poindexter, proposed intervenor-appellant.

*Donald Francis Donovan* of counsel *(Christopher A. Murphy, Jennifer K. Weidman* and *Kathleen M. Conkey* with her on the brief; *Debevoise & Plimpton,* attorneys), for The American College of Obstetricians and Gynecologists and others, *amici curiae.*

*Marcy J. Wilder* of counsel *(Dawn Johnsen, Lois Eisner Murphy, Rebecca Arbogast, Ginger Levy* and *Michael C. Small* with her on brief), for The National Abortion Rights Action League and others, *amici curaie.*

*Joseph W. Dellapenna* and *John D. Murnane* for The American Academy of Medical Ethics, *amicus curiae.*

*James W. Lytle* of counsel *(Carl F. Patka* and *Beth A. Bourassa* with him on the brief; *Whiteman Osterman & Hanna,* attorneys), for New York State Legislature, *amicus curiae.*

*Michael L. Costello (Richard E. Barnes, Vincenza DeFazio, Clarke D. Forsythe, Alan J. Placa, Mildred A. Shanley, Kevin J. Todd, William J. Toohy* and *Eileen M. White* with him on the brief), for The New York State Catholic Conference, *amicus curiae.*

*A. Lawrence Washburn, Jr.,* of counsel *(Mary Bridget Spaulding Balch,* attorney), for New York State Right to Life Committee, Inc., *amicus curiae.*

*Lorna Bade Goodman (Meredith Anne Feinman* of counsel; *O. Peter Sherwood, Corporation Counsel* of New York City), for City of New York, *amicus curiae.*

**OPINION OF THE COURT**

Per Curiam.

Plaintiffs, who include income-eligible women, physicians and various health care organizations, commenced this action for declaratory and injunctive relief to challenge the constitutionality of the New York State Prenatal Care Assistance Program (PCAP), enacted pursuant to chapter 584 of the Laws of 1989 and codified in sections 2521, 2522 and 2529 of the Public Health Law. Defendants, the Commissioners of the New York State Department of Social Services and the Department of Health, are responsible for administering the program and promulgating guidelines thereunder.* PCAP, which was enacted to take advantage of specifically designated Federal funding, was aimed at decreasing infant mortality and promoting the health of infants and mothers. According to its provisions, pregnant women are entitled to receive financial assistance for a wide range of prenatal and postpar-

---

* *Amicus curiae* briefs were submitted on behalf of both parties by the American College of Obstetricians and Gynecologists *et al.;* Catholics for a Free Choice, Anti-Defamation League, *et al.;* National Abortion Rights Action League *et al.;* Members of the New York State Legislature; the Association of the Bar of the City of New York; Amalgamated Clothing & Textile Workers Union *et al.;* American Academy of Medical Ethics; and the New York State Catholic Conference.

tum care whenever their family incomes are between 100 and 185% of the poverty level.

The program, however, does not furnish any funding for other sorts of health care services, and plaintiffs maintain that, by failing to encompass allowances for medically necessary abortions for the class of women covered by PCAP and limiting the use of money to assure a healthy delivery and recovery, the statute's funding scheme is contrary to the New York State Constitution. In that regard, plaintiffs urge that PCAP interferes with these women's right to reproductive choice by improperly pressuring them toward childbirth, thereby violating section 3 of article I (exercise of religion), section 6 of article I (due process), section 11 of article I, (equal protection), section 1 of article XVII (aid, care and support of the needy) and section 3 of article XVII (protection and promotion of the health of the State's inhabitants) of the New York State Constitution.

It is defendants' position that the Legislature's decision to enhance access to prenatal care does not impair the ability of women, whatever their income level, to procure abortions. Defendants assert that the availability of government-funded prenatal care was expanded in order to remedy a special significant problem, the detrimental effect on the health of infants caused by the lack of prenatal care, and that the Legislature devised a reasonable solution to deal with the situation. The Legislature's determination to finance medical services intended to improve infant health, they claim, in no way damages, discriminates against, or even meaningfully relates to a woman's right to an abortion, and, therefore, PCAP is constitutional in all respects. The Supreme Court, unpersuaded by defendants' argument, enjoined New York from denying funding for abortions to women at 100 to 185% of the poverty line, observing that: "Certainly, the dichotomy of care created by PCAP is not designed to ensure that an eligible woman receives the medical assistance best suited for her for it ignores the risks to her health and the likelihood of grave fetal defects if she is left with no alternative but to bear the child when medically unwarranted. Under the existing legislative scheme, a poor working woman in this predicament should be able to raise the funds necessary to obtain an abortion. The wisdom and motivation behind this presumption underlying this policy established by the Legislature not to include funds for abortion, however, are not justiciable issues (*Planned Parenthood Fedn. v Agency for Intl. Dev.*, 915 F2d 59

[2d Cir 1990]; *Klostermann v Cuomo,* 61 NY2d 525). What is justiciable is whether the funding scheme abridges an eligible woman's constitutional right to obtain an abortion free from governmental intrusion." (150 Misc 2d 985, 990.)

The court then proceeded to hold that chapter 584 unconstitutionally discriminates against women's right to reproductive freedom, which is part of the fundamental right to privacy protected by the Due Process Clause of section 6 of article I of the New York State Constitution. The court explained that "the right to privacy involves freedom of choice, the broad general right to make decisions concerning oneself and to conduct oneself in accordance with those decisions free of governmental restraint or interference *(Matter of Doe v Coughlin,* 71 NY2d 48, 52, *cert denied* 488 US 879). The essence of this freedom is the absence of governmental restraint or interference in the personal decisions concerning contraception *(Eisenstadt v Baird,* 405 US 438 [1972]), procreation *(Skinner v Oklahoma,* 316 US 535 [1942]), and abortion *(Roe v Wade,* 410 US 113 [1973] * * *), to name just a few that fall within the ambit of this concept of privacy" *(supra,* at 993). In the opinion of the court *(supra,* at 994), "[t]he right of a pregnant woman to choose an abortion in circumstances where it is medically indicated is one component of the right of privacy", and, by excluding any abortion funding, "PCAP is facially deficient as it cannot fulfill its stated objective to combat infant mortality and promote healthier babies", and, moreover, it unconditionally bases assistance on conduct rather than need.

The court agreed with plaintiffs' contention that PCAP impermissibly steers an eligible indigent woman toward childbirth when it pays all of the expenses incurred in childbirth and none of those associated with terminating a pregnancy. Thus, the court noted, "PCAP becomes an affirmative act by the State blocking a woman without means from obtaining an abortion, possibly creating a serious risk to the woman's life and/or health." *(Supra,* at 996.) The practical effect of chapter 584, the Supreme Court concluded, is to discriminate against women for whom an abortion is medically necessary but cannot afford to pay for such a procedure. The court, while rejecting plaintiffs' claim that PCAP interferes with women's free exercise of religion, nonetheless determined that the program also abridges their rights under the Aid to the Needy, Public Health and Equal Protection Clauses of the New York State Constitution. Defendants have appealed. Fi-

nally, the Supreme Court stayed enforcement of its ruling pending final resolution of any appeals.

In 1986, when Congress first adopted a Federal prenatal care program, the States were not compelled to include such benefits in their own plans. Further, the ambit of Medicaid was not simply extended to fund prenatal care for women whose incomes were below the poverty level, but Congress authorized money to provide prenatal care to women with low incomes that were above the poverty level. However, an amendment in 1989 made it mandatory for States to furnish PCAP to women with incomes at or below 75% of the poverty level and accorded States the option of making services available to women having incomes up to 185% of the poverty level (42 USC § 1396a *[l]* [2] [A] [ii]). More recently, Congress has required States to afford PCAP to women with family incomes up to 133% of the poverty level, and they may provide services to women having family incomes up to 185% of the poverty level (42 USC § 1396a *[l]* [2] [A] [ii] [II]).

Federal PCAP is not Medicaid, and it is easier for a woman to establish eligibility for PCAP than Medicaid. In any event, the New York Legislature, in order to take advantage of Federal funds set aside for PCAP, passed the law in question herein. Prior to the enactment of chapter 584, New York had a more restricted prenatal care program for low-income women which was paid for entirely with State money. Defendants assert that in not supplying funds for abortions or transportation solely for the purpose of obtaining an abortion, State PCAP is consistent with Federal PCAP. Additionally, they stress the vital nature of the State interest entailed in making prenatal and postpartum care available to eligible pregnant women to address the serious and recurrent problems suffered by infants whose mothers did not receive prenatal care.

There is, however, no dispute concerning the critical importance of adequate prenatal and postpartum care to minimize infant mortality and low birth weight. The disagreement arises over the right of needy pregnant women to choose an abortion when one is medically indicated or life-saving. While defendants are correct that any woman is at liberty to obtain an abortion and that PCAP does not interfere with a woman's right in that respect, the fact is that poor women have more circumscribed options. Thus, PCAP will provide them with funds only in connection with prenatal and postpartum care and not otherwise, and the effect is certainly to pressure

women in the direction of giving birth, thereby limiting the reproductive freedom of those women whose family incomes are between 100 and 185% of the poverty level.

The Supreme Court, recognizing that *Roe v Wade* (410 US 113, *supra)*, which first guaranteed the right to abortion, and its progeny could not be extended to apply to the present matter, struck down the abortion funding restraints in PCAP on State constitutional grounds. Indeed, plaintiffs have not raised any Federal claims since Federal constitutional law appears to be insufficient to afford them relief, and the United States Supreme Court has already upheld the sort of restrictions involved herein *(see, Harris v McRae,* 448 US 297). It is, therefore, appropriate to consider the abortion limitations under the State Constitution, which New York courts have repeatedly construed as providing broader protections than those deemed available by the United States Supreme Court under the Federal Constitution.

As the dissent recognizes, the expansion of State constitutional adjudication has a long and rich history. Thus, in numerous instances, the Court of Appeals, declining to be bound by the more limited interpretation of the Federal Constitution by the United States Supreme Court, has determined that Supreme Court cases are not controlling on its own construction of the State Constitution. In that regard, the Court of Appeals has observed that "[u]nder established principles of federalism * * * the States also have sovereign powers. When their courts interpret State statutes or the State Constitution the decisions of these courts are conclusive if not violative of Federal law. Although State courts may not circumscribe rights guaranteed by the Federal Constitution, they may interpret their own law to supplement or expand them" *(People v P. J. Video,* 68 NY2d 296, 302; *see also, People v Scott,* 79 NY2d 474; *People v Hollman,* 79 NY2d 181; *People v Harris,* 77 NY2d 434; *Immuno AG. v Moor-Jankowski,* 77 NY2d 235, *cert denied —* US —, 114 L Ed 2d 713; *People v Vilardi,* 76 NY2d 67; *Matter of Fosmire v Nicoleau,* 75 NY2d 218; *O'Neill v Oakgrove Constr.,* 71 NY2d 521; *Matter of Patchogue-Medford Congress of Teachers v Board of Educ.,* 70 NY2d 57; *People ex rel. Arcara v Cloud Books,* 68 NY2d 553; *Rivers v Katz,* 67 NY2d 485; *People v Class,* 67 NY2d 431; *People v Bigelow,* 66 NY2d 417; *People v Johnson,* 66 NY2d 398; *Cooper v Morin,* 49 NY2d 69, *cert denied sub nom. Lombard v Cooper,* 446 US 984; *People v Isaacson,* 44 NY2d

511; *Tucker v Toia,* 43 NY2d 1; *Byrn v New York City Health & Hosps. Corp.,* 31 NY2d 194; *People v Barber,* 289 NY 378).

■ The Court of Appeals, which clearly has not hesitated to diverge from the more restrictive constitutional law interpretative track pursued by the United States Supreme Court, especially in recent years, has an enduring commitment to an independent and expansive construction of the State Constitution. Therefore, irrespective of how the Federal courts would approach the instant challenge to PCAP, its evaluation under the State Constitution is certainly appropriate. The trial court, in a well-reasoned opinion, relied upon the State Constitution to conclude that chapter 584 is unconstitutional to the extent that it allocates medical funds to needy, pregnant women solely on the basis of whether they choose to carry to term. In *Golden v Clark* (76 NY2d 618, 623), the Court of Appeals, in discussing the assessment of a legislative classification, stated that "[t]he threshold determination is whether the challenged provision establishes a classification which burdens [fundamental] rights. If it does, it must withstand strict scrutiny and is void unless necessary to promote a compelling State interest and narrowly tailored to achieve that purpose".

The State's interest in advancing the cause of healthy mothers bearing healthy babies has no reasonable relationship to the statutory abortion exclusion. The promotion of healthy births is certainly not enhanced by requiring poor women to give birth regardless of the medical implications. Notwithstanding that PCAP purports to be strictly concerned with the health of the child and the mother, it has the effect of forcing needy women to give birth even when this is not medically indicated and is detrimental to their physical and mental well-being. Yet, notwithstanding the dissent's view that PCAP in no way interferes with a woman's exercise of her right of reproductive choice, the fact is that, as a practical matter, low-income women who are unable to obtain aid for therapeutic abortions under PCAP may be compelled to delay or forego altogether medically indicated procedures or to continue pregnancies that undermine their health.

It is, therefore, extremely facile for defendants to take the position that no one is illegally prohibited from procuring an abortion, an argument deemed persuasive by the dissent, when poor women frequently lack the means to pay for an abortion on their own. Since these women usually cannot afford abortions, even ones that are medically necessary,

PCAP, by excluding funding for therapeutic abortions, has the practical effect of being a measure that supports childbirth, sometimes at the expense of the mother's health. This clearly renders chapter 584 in conflict with the requirement that government actions must be constitutionally neutral in affecting the exercise of fundamental rights. As the Court of Appeals declared in *Tucker v Toia (supra),* once the Legislature identifies a group as needy, it may not exclude individuals from the benefits extended to that group by imposing criteria having nothing to do with need. Thus, the State constitutional obligation of section 1 of article XVII to aid, care and support the needy is a "fundamental part of the social contract" which "is not a matter of legislative grace; rather, it is specifically mandated by our Constitution" *(Tucker v Toia, supra,* at 7; *see also, Jiggetts v Grinker,* 75 NY2d 411, 416).

Although the Legislature has great discretion in defining which income categories are "needy", once that determination is made, aid must be furnished neutrally and may not be refused "on the basis of criteria having nothing to do with need" *(Tucker v Toia, supra,* at 9). Having acknowledged that pregnant women with family incomes between 100 and 185% of the poverty level are "needy" and require help in obtaining pregnancy-related health services, the Legislature violated section 1 of article XVII as well as section 3 of article XVII, dealing with the protection and promotion of the health of the State's citizens, by conditioning aid to this needy class on a standard totally unconnected to need or health; that is, whether an otherwise eligible woman undergoes an abortion or gives birth. It is, therefore, simplistic to urge that because PCAP does not preclude women from opting to have an abortion it does not negatively impact upon the reproductive choices of its recipients. The fact is that women who cannot afford to pay for an abortion, even if one is medically necessary, have no choice.

Concern for a woman's health, both physical and mental, has always been one of the prime motivating factors in the recognition of freedom of choice. The trial court herein aptly commented that New York, out of continued attention to the health and welfare of its neediest women, makes Medicaid funds available for abortions for impoverished women despite the failure of the Federal Government to reimburse the State for such expenditures except where the abortion would save the mother's life. Yet, the Legislature has neglected to treat PCAP in the same manner, and defendants justify the distinc-

tion by presuming that women living at 100 to 185% of the Federal poverty level are, unlike those persons eligible for Medicaid, not really needy notwithstanding the fact that chapter 584 was enacted precisely because the covered women were believed to warrant financial assistance with prenatal and postpartum expenses.

■ PCAP also fails to conform to section 6 of article I, the Due Process Clause of the State Constitution, as this section encompasses the right to reproductive choice which is an integral part of the right to privacy and bodily autonomy. The Court of Appeals has described the " 'right to be let alone' " as one of the most valued of rights (*Matter of Doe v Coughlin*, 71 NY2d 48, 52, *supra*, quoting *Olmstead v United States*, 277 US 438, 478 [Brandeis, J., dissenting]). Observed the Court in *Matter of Doe v Coughlin (supra*, at 52), "[t]he right to privacy, in constitutional terms, involves freedom of choice, the broad, general right to make decisions concerning oneself and to conduct oneself in accordance with those decisions free of governmental restraint or interference" *(see also, Matter of New York County DES Litig.*, 168 AD2d 44). Inherent in the right to privacy is the right of an individual to make free choices concerning procreation, contraception and sexual activity *(Matter of Doe v Coughlin, supra; Cooper v Morin, supra)* and the right to bodily autonomy *(Rivers v Katz, supra)*.

The only logical explanation for the discriminatory funding scheme implemented by the Legislature when it adopted PCAP in its present form was that a majority of that body was endeavoring to avoid the political pitfalls accompanying anything even remotely connected to the subject of abortion. However, so long as abortion remains legal in New York State, the Legislature has no power to abolish women's constitutional rights no matter what the personal views of the individual members of that institution might be toward abortion. Once the State assumed the responsibility of helping needy, pregnant women, it was required to do so in a neutral nondiscriminatory manner that does not coerce poor women into choosing childbirth even at the expense of their health and well-being.

■ The trial court also properly determined that the constitutional defect in PCAP would best be remedied by expanding the ambit of the program to include funding for medically indicated abortions rather than voiding the law in its entirety, and it appears that this alternative is consistent with the predominant sentiment of the Legislature. In addi-

tion, the remainder of the trial court's order also warrants an affirmance. Specifically, proposed intervenors have not demonstrated a real and substantial interest in the litigations or that defendants are unable to adequately protect the interests of those who seek to uphold the validity of chapter 584. Consequently, it was not an abuse of discretion to deny the motions to intervene (see, Vantage Petroleum v Board of Assessment Review, 61 NY2d 695).

Order and judgment of the Supreme Court, New York County (Carmen Beauchamp Ciparick, J.), entered on June 12, 1991, which denied the various motions for leave to intervene, granted defendants' cross motion for summary judgment to the extent that it seeks dismissal of plaintiffs Jane Moe, the Reverend Richard S. Gilbert and the Reverend Julia Quinlan as parties plaintiff for lack of standing and a declaration that chapter 584 of the Laws of 1989 does not violate the Free Exercise Clause of the New York State Constitution (art I, § 3) and otherwise denied defendants' cross motion for summary judgment, granted plaintiffs' application for a declaration that chapter 584 of the Laws of 1989 violates sections 6 and 11 of article I, and sections 1 and 3 of article XVII of the New York State Constitution insofar as it denies funding for medically necessary abortions for otherwise eligible women, enjoined defendants from denying such funding and ordered and declared that the subject Prenatal Care Assistance Program be expanded to include funds for medically necessary abortions, is affirmed, without costs or disbursements. The stay of the order and judgment is continued pending any appeal to the Court of Appeals.

MURPHY, P. J. (dissenting). The issue on this appeal is not whether there is a constitutional right to choose to abort a pregnancy. The guarantee of that right by the United States Constitution is by now an established jurisprudential fact (Roe v Wade, 410 US 113; Planned Parenthood v Casey, 505 US —, 112 S Ct 2791). Nor is there any issue as to the existence of such a right under the New York State Constitution, for it may be conceded, as in fact the defendants have, that the State Constitution's protections in the area of reproductive choice are at least as extensive as those of the Federal Constitution. Indeed, it may even be conceded, as the plaintiffs argue, that the protections afforded in the subject area by the State Constitution exceed those of the Federal Constitution: that the right of reproductive choice is fundamental under the

State Constitution and that any infringement thereon by the State will be found constitutionally offensive unless justified by a compelling State interest and supported by a showing that less restrictive alternatives were unavailable.[1] The grant of these propositions, however, for the sake of argument, if not indeed as fairly evident corollaries of established State substantive due process jurisprudence,[2] does not decide but merely frames the issue before us. For the issue upon which this appeal most fundamentally turns is not whether there is a right such as the plaintiffs urge, but whether, assuming such a right to exist, it has been infringed in any legally cognizable way.

As is here relevant, the plaintiffs are women who are or have been eligible to receive benefits made available under the New York State Prenatal Care Assistance Program (L 1989, ch 584 [hereinafter PCAP]). PCAP provides women with incomes between 100 and 185% of the poverty line a wide array of prenatal services and benefits with the objective of decreasing the incidence of underweight newborns and concomitantly reducing the rate of infant morbidity and mortality.[3] There is

---

1. In the years since *Roe v Wade (supra)*, of course, the Federal courts have increasingly come to view a woman's right of reproductive choice as a "limited" fundamental right which may be burdened even where there is no compelling State interest to be vindicated; the requirement of a compelling State interest it would appear is being replaced on the Federal level by the considerably less rigorous demand that, if a woman's right of reproductive choice is to be burdened, the burden not be "undue" *(see, Planned Parenthood v Casey, supra)*.

2. The Court of Appeals has, after all, already recognized in construing the New York State Constitution's Due Process Clause that "In our system of a free government, where notions of individual autonomy and free choice are cherished, it is the individual who must have the final say in respect to decisions regarding his medical treatment in order to insure that the greatest possible protection is accorded his autonomy and freedom from unwanted interference with the furtherance of his own desires [citations omitted]" *(Rivers v Katz, 67 NY2d 485, 493)*. It would be difficult, to say the least, to reconcile this expansive view of the substantive content of the Due Process Clause with any less than compellingly justified attempt by the State to interfere with a woman's election to terminate her pregnancy, particularly when, as is the case with the plaintiffs in this lawsuit, termination is the medically recommended course.

3. These purposes were clearly the dominant ones behind PCAP's enactment. The justifications offered for the legislation by the Governor and by sponsors in both the Senate and the Assembly uniformly stressed the need to address the very serious problems associated with the unnecessarily high incidence of underweight newborns. And, in signing chapter 584 into law, Governor Cuomo, referring pointedly to the need the legislation was intended to address, stated, "New York State continues to maintain an

no dispute that the program has markedly improved the access of eligible women to prenatal care and that the children born to these women have as a consequence had a healthier start in life. No one questions that the program as it is presently constituted has been immensely beneficial. Beneficial as the program has been, however, the unavoidable premise of this lawsuit is that it is constitutionally offensive; that from a legal standpoint at least, the absence of any prenatal care assistance program would be preferable to the one which the Legislature has enacted.

What then is the defect said to render PCAP constitutionally infirm? It is quite simply that while PCAP funds virtually all prenatal health care necessary to bring a pregnancy to term, it does not fund medically necessary abortions. The failure to include abortion funding within PCAP, the plaintiffs contend, violates both the Due Process and Equal Protection Clauses of the New York State Constitution as well as sections of the State Constitution, respectively, requiring that provision be made for the needy (art XVII, § 1) and for protecting and promoting the health of State inhabitants (art XVII, § 3).

The viability of plaintiffs' due process claim depends at the outset upon whether the complained-of legislation can be shown to infringe upon the right at issue, namely, the right of a woman to chose whether or not to bring a pregnancy to term. Plainly, if there is no demonstrable infringement the analysis need go no further (Golden v Clark, 76 NY2d 618, 627-630).

Certainly there is no ordinary sense in which PCAP may be said to interfere with a woman's exercise of her right of reproductive choice. To the contrary, there is no reproductive option that a PCAP eligible woman might elect that PCAP would not significantly ease. As noted, if a woman chooses to carry her pregnancy to term PCAP will pay for nearly all the pregnancy-related costs entailed by that decision, and if, on the other hand, a woman chooses to terminate her pregnancy by means of an abortion PCAP will still pay for the same array of pregnancy-related services until the abortion, and for postpartum care for 60 days thereafter. Thus, although PCAP does not fund abortions, it does defray many of the other often

---

unacceptably high rate of low birthweight and infant mortality. The provision of prenatal care services has proved to be effective in ameliorating these tragic problems" (Mem of State Exec Dept, 1989 McKinney's Session Laws of NY, at 2218).

more costly expenses incurred as a consequence of pregnancy and so leaves a PCAP recipient with significantly more resources to pay for an abortion should she choose to have one.

There really is no question that PCAP substantially facilitates the reproductive options of its recipients. The plaintiffs do not, and indeed cannot, dispute this. Rather, they argue in essence that PCAP is constitutionally flawed because it does not facilitate all reproductive options equally. It is urged that because PCAP, while funding other pregnancy-related services, provides no direct subsidy for abortion, the legislation has the effect of pressuring eligible women to continue with pregnancies they might otherwise elect to abort. Thus, plaintiffs claim that the reproductive choice vouchsafed to them by the Constitution has, by PCAP's unequal allocation of benefits, been wrested from them.

To be clear, the argument advanced by plaintiffs is not that PCAP makes abortions less affordable or in any other practical sense less accessible, for it does not, but rather that its funding scheme constitutes an unbalanced inducement for women to have babies rather than abortions. The offer by government of such an unbalanced inducement, it is said, impermissibly pressures a woman to carry a pregnancy to term and in so doing may ultimately subvert a woman's exercise of her constitutional prerogative to decide for herself whether she will bear a child.[4]

The very great difficulty with this argument is that funding for pregnancy-related services cannot reasonably be viewed as an inducement to pregnancy or its continuation. The decision to have a child is one laden with tremendous personal and economic consequence. It would not be rational to suppose that a woman not otherwise disposed to do so, would undertake to bear the considerable risks and discomforts of pregnancy and the enormous ensuing responsibilities of parenthood simply because the government had offered to pay for some of the medical costs occasioned by the pregnancy. This is particularly true of the women for whom the entitlement to a government-funded abortion is here at issue, for these women have, by hypothesis, been advised that an abortion is medically necessary. Obviously, the government's offer to fund the continuation of pregnancy cannot, under such circumstances be regarded as an "inducement". One does not embrace seri-

---

4. The classic statement of this argument may be found in Justice Brennan's dissent in *Harris v McRae* (448 US 297, 333-334).

ous and in some cases life-threatening health risks simply to obtain a subsidy, particularly where, as here, the need for the subsidy can be eliminated along with the risk by following medical advice. There may, of course, be compelling reasons for a woman to choose to continue a pregnancy her doctor has advised her to terminate, but these will undoubtedly be rooted in deep personal, religious, or ethical considerations; they will not conceivably stem from an offer of an economic benefit such as the one here challenged, so utterly insignificant as a decisional determinant when viewed in the context of the enormous risk and obligation its receipt entails.

The record is, in fact, completely devoid of evidence showing that any one of the plaintiffs, much less that the plaintiff class generally, viewed PCAP as an inducement to continue with unwanted and medically contraindicated pregnancies. To the contrary, plaintiffs uniformly wish to terminate their pregnancies notwithstanding any birth-oriented inducement PCAP is alleged to contain, and if they are or have been prevented from doing so, it is not by reason of PCAP but by their own lack of financial resources. In the end then, plaintiffs' choice is limited not by the enactment about which they complain but rather by underlying economic circumstances existing despite rather than because of the considerable benefits PCAP provides.

Indeed, to the extent that PCAP is at all relevant to a woman's decision respecting whether to abort a pregnancy, it would seem to have an effect precisely opposite to that which the plaintiffs' argument requires. For, by dramatically improving the accessibility of prenatal medical supervision, PCAP helps assure that women receive appropriate medical care early in their pregnancies and, accordingly, that they are timely advised of any health risks which might render the continuation of a pregnancy medically ill-advised. Thus, far from discouraging abortion or providing an inducement to carry a pregnancy to term, PCAP goes a long way toward insuring that medically relevant information and advice, including that indicating the need to abort a pregnancy, will be afforded and afforded at a time when abortion is still a relatively inexpensive and safe option. If PCAP may be said to have any effect on a woman's decision respecting the fate of her pregnancy then, it would seem far more probable that it would be to encourage women to make medically prudent choices—which is to say to encourage women in medically appropriate circumstances to obtain abortions—rather than to

encourage the continuation of unwanted and potentially dangerous pregnancies. The scenario urged by the plaintiffs in which women are lured ever further into medical jeopardy and drawn inexorably toward the immense open-ended responsibilities of parenthood by the promise of limited pregnancy-related care is not only highly improbable but completely without evidentiary support.

As the plaintiffs have not met their burden of showing that PCAP interferes in some real way with their reproductive prerogatives, either by the interposition of affirmative obstacles to the free exercise of their choice between reproductive alternatives, or by the offer of inducements sufficiently meddlesome to dictate a decision which the Constitution makes free, I believe that the plaintiffs' due process claim must fail. The challenged legislation simply does not infringe any constitutionally protected liberty or privacy interest. Obviously, the legislation does not facilitate all reproductive choices as fully as it might, or, indeed, as fully as might be optimal from a public policy perspective. The initial and sole relevant due process question, however, is not whether the legislation is perfectly designed to accomplish certain policy objectives, or whether it is in an absolute sense neutral in its facilitation of alternatives, but whether it is in some manner offensive to interests guarded by the substantive component of the State Constitution's Due Process Clause. While, perhaps arguably, a more perfect concept of due process would entail the provision of necessary medical care to all, it would seem clear that current notions of due process are not so encompassing. Rather, as is here relevant, the far more narrowly drawn interest protected under the rubric of due process is that of the individual in making decisions respecting his or her physical and mental well-being autonomously, which is to say free of unwanted government participation (see, Rivers v Katz, supra). That interest has not been in any manner compromised by the challenged legislation.

Turning now to plaintiffs' equal protection argument, it hinges essentially upon the claim that the Legislature in failing to include abortion funding among PCAP's benefits, denied the plaintiffs benefits to which they would otherwise be entitled, impermissibly premising the denial upon the manner in which the plaintiffs and those in their putative class have chosen or would choose to exercise their reproductive rights.

It is, of course, true that, although government may be under no initial obligation to extend a benefit, once it has

determined to do so it may not condition receipt of the benefit upon the relinquishment of a constitutional right. The question presented, then, is whether it has been shown that the Legislature has, in fact, withheld a benefit to which the plaintiffs would otherwise be entitled on the ground that plaintiffs have elected, as is their basic right, to obtain abortions.

To begin, it is quite clear that PCAP itself does not condition the receipt of any benefit it provides upon a woman's surrender of her right to abort a pregnancy; a pregnant woman who meets PCAP's income eligibility standards is not disqualified from receiving any benefit made available by PCAP by reason of her election to obtain an abortion. Plaintiffs' objection to the legislation then, cannot be that what the legislation *does* provide is meted out on a discriminatory basis; it is rather that what the legislation *does not* provide, namely, funding for medically necessary abortions, was omitted by reason of the Legislature's hostility toward and consequent discrimination against women who choose to have abortions. Hence, as I understand it, it is the plaintiffs' position that but for the Legislature's discriminatory animus, the legislation would of necessity have contained the benefit they seek—that the benefit is so closely entailed by the scope of the enactment as to preclude any neutral, nondiscriminatory explanation for its noninclusion. I gather it is upon this premise that the plaintiffs characterize the absence of abortion funding from PCAP as an "exclusion", as if to say that only an act of radical excision could account for the omission of an element so organically necessary to the enactment. Thus it is that plaintiffs come to argue that a posited "abortion exclusion" has deprived them of a benefit to which they would otherwise be entitled.

This argument has been raised with some success in actions challenging the exclusion of abortion funding from State Medicaid coverage *(see, e.g., Committee to Defend Reproductive Rights v Myers,* 29 Cal 3d 252, 625 P2d 779; *Doe v Maher,* 40 Conn Supp 394, 515 A2d 134; *Right to Choose v Byrne,* 91 NJ 287, 450 A2d 925; *but see, Fisher v Commonwealth of Pa., Dept. of Pub. Welfare,* 509 Pa 164, 501 A2d 617).[5] And, in that context, I am inclined to agree that it is persuasive. Medicaid,

5. The argument was perhaps most persuasively, although unsuccessfully, made by Justice Stevens in his dissent in *Harris v McRae* (448 US 297, 349-357, *supra).*

of course, proceeds from the premise that its intended recipients are in need of comprehensive health coverage. When the Legislature begins by recognizing such overarching need and then excludes from the otherwise inclusive coverage afforded in light of that recognition, one item unarguably necessary to the facilitation of a constitutionally protected choice, the inference that the Legislature has denied a benefit which it would have otherwise provided and has done so simply out of antipathy toward the exercise of the right at issue, is very strong. Indeed, I am unable to perceive any doctrinally consistent nondiscriminatory justification for such an exclusion.[6]

The situation at bar is materially different. In its enactment of PCAP, the Legislature neither recognized nor purported to address a wider need for comprehensive Medicaid coverage; what the Legislature did do was to extend certain Medicaid benefits selectively in order to assist women with incomes just in excess of the maximum allowable for Medicaid eligibility, to afford the often extraordinarily expensive medical care necessary to maintain a healthy pregnancy—the Legislature's express objective being that of reducing, to the extent possible, what were widely regarded at the time of PCAP's enactment, to be unacceptably high levels of infant mortality and morbidity attributable to inadequate prenatal care. Thus, not only does PCAP not constitute a blanket extension of comprehensive Medicaid benefits, it does not even purport to be comprehensive within the field it addresses; it does not provide all pregnancy-related care, but, in the main, only such care as is reasonably necessary to assure, insofar as that assurance may be had, that if a woman chooses to carry her pregnancy to term she will bear a healthy child. Abortion, then, although

---

6. Abortion funding exclusions from Medicaid have been justified by invocation of the State's interest in protecting potential life (see, e.g., Harris v McRae, 448 US 297, 324-326, supra), but the relevance of the State's interest in potential life in situations where a pregnant woman's actual life or health is in jeopardy has never been explained. Roe v Wade (410 US, supra, at 165), of course, held unequivocally that even after fetal viability a State may not interfere with a woman's right to obtain an abortion "where it [abortion] is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother"; this is a holding expressly reaffirmed in Planned Parenthood v Casey (505 US —, 112 S Ct 2791, supra). As Justice Stevens observed in his Harris v McRae dissent, "If a woman has a constitutional right to place a higher value on avoiding either serious harm to her own health or perhaps an abnormal childbirth than on protecting potential life, the exercise of that right cannot provide the basis for the denial of a benefit to which she would otherwise be entitled" (448 US, supra, at 351).

undoubtedly an indispensible component of comprehensive prenatal medical care, is not entailed by PCAP's specific objectives. Although PCAP may, in some incidental, though not inconsiderable, respects make matters easier for a woman who has decided upon an abortion, the principal concern of the legislation is with the consequences, not of a decision to abort, but of one to carry a pregnancy to term.

It is important to stress that the question with which we now deal is not whether the Legislature has by focusing more or less exclusively upon the consequences of a pregnant woman's decision to see her pregnancy through, infringed any substantive right of reproductive choice protected by the Due Process Clause; that question has been considered and, as noted, no such infringement has been shown. Rather, the presently relevant inquiry is whether, even though it has committed no due process violation, the Legislature has nevertheless impermissibly compromised the plaintiffs' right to equal treatment under the law by withholding or "excluding" a benefit to which the plaintiffs would be otherwise entitled, out of hostility toward the right which the benefit would facilitate.

In contrast to the Medicaid cases in which abortion funding had, in fact, been specifically excluded from previously established baselines of comprehensive health care entitlement without any doctrinally acceptable, nondiscriminatory justification, here there has been no exclusion but merely a failure to include which, as noted, is unremarkable given PCAP's limited objectives. No inference of legislative exclusion can be drawn where inclusion of the sought benefit is not only unprecedented, as it is in the present context, but is unnecessary to the achievement of the legislation's ends. To say that PCAP might be a very much better piece of legislation if it included funding for medically necessary abortions is quite possibly true but irrelevant to the inquiry at hand which, when reduced to its essentials, is whether, in the absence of the funding sought, PCAP must be viewed as incomplete, or, in other words, as legislation from which an indispensable element had been in some sense "excluded". As it would seem evident in light of the foregoing discussion of PCAP's purview, that there is nothing necessary about the legislation's inclusion of abortion funding, it follows that the plaintiffs have not established the existence of an exclusion, or, put differently, the existence of a benefit to which they would have been entitled had the baseline of entitlement implicitly set by the

enactment been maintained in a consistent, nondiscriminatory fashion. The fact is that the baseline of entitlement which PCAP does establish, as distinguished from the baseline which the plaintiffs think it ought to establish, is not sufficiently high for plaintiffs to prevail on their equal protection claim.

Plaintiffs' remaining arguments, relying on provisions of the State Constitution mandating aid to the needy and the protection and promotion of the health of State inhabitants, do not cover significant new ground. They rest essentially upon the assertion that the Legislature, having acknowledged the plaintiffs' need of pregnancy-related medical care, defaulted in meeting its consequent constitutional obligation to provide such care. This, however, mischaracterizes what the Legislature has done. While it is true that the Legislature's enactment of PCAP does reflect an acknowledged need for wider access to prenatal services, it does not follow that the extent of the acknowledged need is as great as the plaintiffs claim. As noted, PCAP's enactment was prompted by and intended to address a specific problem, namely, the high incidence of underweight infants with associated serious and sometimes fatal health impairments, born to women who had not received appropriate prenatal care. It was thought, with now demonstrable justification, that by affording wider access to such care, the outcomes of those pregnancies which were taken to term would be improved. Plainly, the Legislature's principal concern was to assure that pregnant women would receive the medical supervision and care necessary to minimize the chances of neonatal distress and its long-term sequellae, the human and financial cost of which have been prohibitively high. It is equally plain that the availability of abortions does not advance this discrete objective. Indeed, an offer by the government to fund abortions would not be relevant to the health of newborn infants; while it would undoubtedly facilitate the termination of pregnancies with potentially problematic outcomes, it would not in any way improve the outcomes of those pregnancies which were brought to term. Of course, the availability of abortion funding may affect whether a woman of limited means will be able to obtain an abortion, but the purpose of PCAP is not to assure the availability of abortions to all who want or need them, but rather to help assure that those pregnancies which are carried to term have the healthiest possible outcomes. This is not to say that PCAP-eligible women, whose incomes barely surpass the poverty level, are not in need of assistance in obtaining medically

necessary abortions or that it would not be a provident exercise of legislative discretion to provide such assistance, for certainly there is strong indication in the record before the Court that such a need may exist, only that that need was neither expressly nor implicitly recognized by the Legislature when it enacted PCAP, the objectives of which simply do not entail such recognition.

The constitutional provisions upon which the plaintiffs rely, of course, do not mandate that the Legislature, in the course of fulfilling its constitutional obligation to the needy, meet every need at once, but only "in such manner and by such means, as the legislature may from time to time determine" (NY Const, art XVII, § 1). It is thus within the Legislature's discretion to determine the extent of the need to be addressed *(Tucker v Toia,* 43 NY2d 1, 8). And, while that discretion must be reasonably exercised, there is nothing in the present record to suggest that PCAP represents an instance in which the Legislature's discretion was abused. The Legislature's determination to deal with the distinct and pressing problem of poor neonatal health without at the same time comprehensively addressing all aspects of prenatal medical care was entirely reasonable, and certainly no one would contend that the very substantial benefits which the Legislature has provided are not reasonably related to, and in fact have not significantly promoted, the Legislature's laudable and, I believe, permissible, objectives.

It is undisputed that not one of the constitutional provisions upon which the plaintiffs rely itself requires the government to fund abortions. Rather, the claim which has been presented in this litigation is that the Legislature's voluntary determination to confer some benefits has triggered a duty under each of the aforecited sections of the State Constitution to afford additional assistance, minimally including funding for medically necessary abortions. The common question then, is whether the Legislature has by its own action incurred a greater obligation than it has filled. In addressing this inquiry, it is or ought to be irrelevant, whether we approve or disapprove of abortion or think that it would be prudent from a policy perspective to afford women of very modest means a more comprehensive array of essential medical services during pregnancy. It is not for courts to make health care policy; that is the domain of the Legislature. Our only permissible role, in the present context, is to discern the reach of the governmental obligation the Legislature may be fairly said to have

triggered by its own act. When we exceed this role, as I believe this Court has, we assume authority alien to the judicial function and not within its competence; we violate the constitutionally mandated separation of judicial and legislative powers.

Accordingly, the judgment of the Supreme Court, New York County (Carmen Beauchamp Ciparick, J.), entered June 12, 1991, which, *inter alia,* granted the plaintiffs' application for a preliminary injunction, declaring chapter 584 of the Laws of 1989 unconstitutional insofar as it failed to provide funding for medically necessary abortions and declaring that chapter 584 must be expanded to include such funding, should be reversed, the injunction denied and the challenged enactment declared constitutional.

MILONAS, WALLACH, KASSAL and RUBIN, JJ., concur; MURPHY, P. J., dissents in a separate opinion.

Order and judgment of the Supreme Court, New York County, entered on June 12, 1991, which denied the various motions for leave to intervene, granted defendants' cross motion for summary judgment to the extent that it seeks dismissal of plaintiffs Jane Moe, the Reverend Richard S. Gilbert and the Reverend Julia Quinlan as parties plaintiff for lack of standing and a declaration that chapter 584 of the Laws of 1989 does not violate the Free Exercise Clause of the New York State Constitution (art I, § 3) and otherwise denied defendants' cross motion for summary judgment, granted plaintiffs' application for a declaration that chapter 584 of the Laws of 1989 violates sections 6 and 11 of article I, and sections 1 and 3 of article XVII of the New York State Constitution insofar as it denies funding for medically necessary abortions for otherwise eligible women, enjoined defendants from denying such funding and ordered and declared that the subject Prenatal Care Assistance Program be expanded to include funds for medically necessary abortions, is affirmed, without costs or disbursements. The stay of the order and judgment is continued pending any appeal to the Court of Appeals.