446 S.E.2d 658

WOMEN'S HEALTH CENTER OF WEST VIRGINIA, INC., Women's Health Services, Inc., and West Virginia Free, on Behalf of Themselves and All Medicaid–Eligible Women in West Virginia, Plaintiffs Below, Appellants,

and

The West Virginia Chapter of the National Organization for Women, Intervening Plaintiff, Appellee,

v.

Ruth Ann PANEPINTO, PH.D., Secretary, West Virginia Department of Health and Human Resources; and Nancy J. Tolliver, Commissioner, Bureau of Administration and Finance, Department of Health and Human Services, Defendants Below, Appellants,

and

Karen A. Cross, Rebecca A. Romero, Charlotte S. Snead, Dianne Fowler, Rev. Wayne Swisher, Jay Gould, Dr. Ric Day, Linda Day, Phyllis Martin, Kim Hale, Karen Austin, Leonard Anderson, Keith Wagner, Donna Boley, Odell Huffman,

Barbara Warner, Ben Vest, Steve Harrison, Dick Henderson, Danny Ellis, Larry Hendricks, John Pino, Larry Border, Tom Louisos, Jay Nesbitt, Farrell Johnson, Ron Walters, Kenneth Adkins and Randy Schoonover, Taxpayers and Citizens of the State of West Virginia, and West Virginians for Life, Inc., A West Virginia Corporation, Intervening Defendants Below, Appellees.

WOMEN'S HEALTH CENTER OF WEST VIRGINIA, INC., Women's Health Services, Inc., and West Virginia Free, on Behalf of Themselves and All Medicaid–Eligible Women In West Virginia, Plaintiffs Below, Appellees,

and

The West Virginia Chapter of the National Organization for Women, Intervening Plaintiff, Appellant,

v.

Ruth Ann PANEPINTO, PH.D., Secretary, West Virginia Department of Health and Human Resources; and Nancy J. Tolliver, Commissioner, Bureau of Administration and Finance, Department of Health and Human Services, Defendants Below, Appellees,

and

Karen A. Cross, Rebecca A. Romero, Charlotte S. Snead, Dianne Fowler, Rev. Wayne Swisher, Jay Gould, Dr. Ric Day, Linda Day, Phyllis Martin, Kim Hale, Karen Austin, Leonard Anderson, Keith Wagner, Donna Boley, Odell Huffman, Barbara Warner, Ben Vest, Steve Harrison, Dick Henderson, Danny Ellis, Larry Hendricks, John Pino, Larry Border, Tom Louisos, Jay Nesbitt, Farrell John-

---

son, Ron Walters, Kenneth Adkins and Randy Schoonover, Taxpayers and Citizens of the State of West Virginia, and West Virginians for Life, Inc., A West Virginia Corporation, Intervening Defendants Below, Appellees.

**WOMEN'S HEALTH CENTER OF WEST VIRGINIA, INC.,** Women's Health Services, Inc., and West Virginia Free, on Behalf of Themselves and All Medicaid–Eligible Women in West Virginia, Plaintiffs Below, Appellees,

and

The West Virginia Chapter of the National Organization for Women, Intervening Plaintiff, Appellee,

v.

Ruth Ann PANEPINTO, PH.D., Secretary, West Virginia Department of Health and Human Resources; and Nancy J. Tolliver, Commissioner, Bureau of Administration and Finance, Department of Health and Human Services, Defendants Below, Appellees,

and

Karen A. Cross, Rebecca A. Romero, Charlotte S. Snead, Dianne Fowler, Rev. Wayne Swisher, Jay Gould, Dr. Ric Day, Linda Day, Phyllis Martin, Kim Hale, Karen Austin, Leonard Anderson, Keith Wagner, Donna Boley, Odell Huffman, Barbara Warner, Ben Vest, Steve Harrison, Dick Henderson, Danny Ellis, Larry Hendricks, John Pino, Larry Border, Tom Louisos, Jay Nesbitt, Farrell Johnson, Ron Walters, Kenneth Adkins and Randy Schoonover, Taxpayers and Citizens of the State of West Virginia, and West Virginians for Life, Inc., A West Virginia Corporation, Intervening Defendants Below, Appellants.

Nos. 21924 to 21926.

Supreme Court of Appeals of West Virginia.

Submitted Nov. 30, 1993.

Decided Dec. 17, 1993.

Dissenting Opinion of Justice McHugh July 21, 1994.

Roger Forman, Forman & Crane, Charleston, Kathryn Kolbert, Eve C. Gartner, The Center for Reproductive Law & Policy, New York, New York City, for Women's Health Center.

John M. Hedges, Charleston, Barbara Fleischauer, Morgantown, for NOW.

Thomas M. Woodward, Deborah L. McHenry, Deputy Attys. Gen., Charleston, for Health & Human Resources.

John Andrew Smith, Stephen A. Weber, Geoffry A. Haddad, Kay, Casto, Chaney, Love & Wise, Charleston, for Cross, et al.

WORKMAN, Chief Justice:

Appellants challenge the August 25, 1993, order of the Circuit Court of Kanawha County upholding the constitutionality of West Virginia § 9-2-11 (Supp.1993),[1] which bans

**1.** West Virginia Code § 9-2-11 imposes the following limitations on the use of medicaid funds:
　　(a) No funds from the medicaid program accounts may be used to pay for the performance of an abortion by surgical or chemical means unless:

the use of state medicaid[2] funds for abortions except in limited circumstances. Those individuals and organizations, to whom we collectively refer as Appellants,[3] claim that to deny those abortions which are determined to be "medically necessary,"[4] violates the West Virginia Constitution. After extensive consideration of the submitted record, numerous briefs, and the arguments of counsel, we conclude that West Virginia Code § 9–2–11 constitutes a discriminatory funding scheme which violates an indigent woman's constitutional rights.

Senate Bill 2, in essence a medicaid tax reform bill, was introduced and passed by the Legislature during a second special session in May 1993. Also contained within the provisions of Senate Bill 2 was the text of West Virginia Code § 9–2–11.[5] A change in federal law prohibiting West Virginia from relying on the fund-raising sources previously used to raise its share of medicaid funds necessitated the drafting of Senate Bill 2. During the regular legislative session, there was no public discussion of adding any abortion-restrictive riders to the medicaid tax reform bill. This language, the text of West Virginia Code § 9–2–11, was added during the final hours of the second extraordinary legislative session. Although Governor Caperton signed the bill into law on June 4, 1993, he publicly stated his reservations concerning the constitutionality of the abortion-funding restrictions included in Senate Bill 2.[6]

On July 9, 1993, the Women's Health Center of West Virginia, Inc., Women's Health Services, Inc., and West Virginia Free, on behalf of themselves and all medicaid-eligible women in West Virginia filed a complaint in

---

(1) On the basis of the physician's best clinical judgment, there is:

(i) A medical emergency that so complicates a pregnancy as to necessitate an immediate abortion to avert the death of the mother or for which a delay will create grave peril of irreversible loss of major bodily function or an equivalent injury to the mother: Provided, That an independent physician concurs with the physician's clinical judgment; or

(ii) Clear clinical medical evidence that the fetus has severe congenital defects or terminal disease or is not expected to be delivered; or

(2) The individual is a victim of incest or the individual is a victim of rape when the rape is reported to a law-enforcement agency.

(b) The Legislature intends that the state's medicaid program not provide coverage for abortion on demand and that abortion services be provided only as expressly provided for in this section.

2. Medicaid is a joint federal-state entitlement program that provides funding for various medical services to the poor. *See* 42 U.S.C.A. § 1396b (West 1992 & Supp.1993).

3. The Appellants include the following groups and individuals: Women's Health Center of West Virginia, Inc., Women's Health Services, Inc., West Virginia Free, on behalf of themselves and all medicaid-eligible women in West Virginia, the West Virginia Chapter of N.O.W., Ruth Ann Panepinto, Secretary, West Virginia Department of Health and Human Services, and Nancy J. Tolliv-

er, Commissioner, Bureau of Administration and Finance, Department of Health and Human Resources.

4. Under federal law and regulations, all medical services must be "medically necessary." *See* 42 U.S.C.A. §§ 1396, 1396a(a)(10)(A), 1396d(a) (West 1992 & Supp.1993). For determining whether a submitted medical expense qualifies as medically necessary, the West Virginia Department of Health and Human Services has adopted Policy No. MA–85–4, which provides that the Department: "makes reimbursement for pregnancy termination when it is determined to be medically advisable by the attending physician in light of physical, emotional, psychological, familial, or age factors (or a combination thereof) relevant to the well-being of the patient."

5. During oral argument, counsel for N.O.W. advised the Court that the same language of West Virginia Code § 9–2–11, which passed when tacked on to the medicaid tax reform bill, had previously been submitted as a separate bill on twenty-three separate occasions and failed each time.

6. In fact, the Governor instituted a civil action in the Circuit Court of Kanawhy County on June 7, 1993, against the Secretary of the West Virginia Department of Health and Human Services for the purpose of having the abortion-restrictive language contained in Senate Bill 2 declared unconstitutional. This action was dismissed pursuant to defendant's Rule 12(b)(6) motion for

the Circuit Court of Kanawha County, seeking to have that portion of Senate Bill 2, which became West Virginia Code § 9–2–11, declared unconstitutional. Following a trial on this matter on August 11 and 12, the circuit court entered its ruling on August 25, 1993, declaring the challenged portion of Senate Bill 2 constitutional. The circuit court ordered Secretary Panepinto and Commissioner Tolliver to immediately implement the subject provisions of Senate Bill 2 and West Virginia Code § 9–2–11, and denied Appellants' motion for a stay pending appeal absent the posting of a $350,000 bond, which they were unable to post. On September 7, 1993, Appellees filed a motion with this Court requesting a stay pending appeal, which we granted on that same date.[7]

In preface to the discussion to follow, we borrow the opening comments of another tribunal faced with similar issues:

At the outset, to dispel certain misconceptions that have appeared in this case, we must clarify the precise, narrow legal issue before this court. First, this case does *not* turn on the morality or immorality of abortion, and most decidedly does not concern the personal views of the individual justices as to the wisdom of the legislation itself or the ethical considerations involved in a woman's individual decision whether or not to bear a child. Indeed, although in this instance the Legislature has adopted restrictions which discriminate against women who choose to have an abortion, similar constitutional issues would arise if the Legislature—as a population control measure, for example—funded [medicaid] ... abortions but refused to provide comparable medical care for poor women who choose childbirth. Thus, the constitutional question before us does not involve a weighing of the value of abortion as against childbirth, but instead concerns the protection of either procreative choice from discriminatory governmental treatment.

*Committee to Defend Reprod. Rights v. Myers,* 29 Cal.3d 252, 256, 625 P.2d 779, 780, 172 Cal.Rptr. 866, 867 (1981) (emphasis supplied).

Contrary to Appellees' representation, the question before this Court is not whether the state is obligated to subsidize the exercise of a woman's right to have an abortion. Rather, the issue presented is whether, once the state undertakes funding of medical care for the poor, which includes funding for childbirth, can the state deny funding for medically necessary abortion services? More specifically, does the limitation of funds to certain legislatively-specified reproductive services violate the constitutional protections afforded the indigent female citizens of this state?

We begin our analysis by addressing Appellees' contention that the decision of the United States Supreme Court in *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), which upheld the funding restrictions imposed by the Hyde Amendment,[8] should control the outcome of this case. At issue in *Harris,* was whether the denial of public funding via the Medicaid program for certain medically necessary abortions violated the liberty or equal protec-

lack of justiciable controversy and because the Governor had waived his right to bring the action, having signed and not vetoed the legislation. *See* W.Va.R.Civ.P. 12(b)(6).

7. The Appellants similarly filed a motion seeking a stay pending appeal with this Court. Having already granted the stay motion filed by Appellees, we denied Appellants' stay motion as moot.

8. The Hyde Amendment, the federal counterpart to West Virginia Code § 9–2–11, which was in effect at the time of the *Harris* decision provided:

'[N]one of the funds provided by this joint resolution [Medicaid funding] shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims of rape or incest when such rape or incest has been reported promptly to a law enforcement agency or public health service.'

*Harris,* 448 U.S. at 302, 100 S.Ct. at 2680 (quoting from the version of the Hyde amendment in effect for fiscal year 1980, Pub.L. No. 96–123, § 109, 93 Stat. 926). The current Hyde Amendment reads:

, None of the funds contained in this Act shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term. Pub.L. No. 102–170, § 203, 105 Stat. 1126 (1992).

tion guarantees of the Due Process Clause of the Fifth Amendment or either of the religion clauses of the First Amendment. 448 U.S. at 301, 100 S.Ct. at 2680. Recognizing that a woman's decision whether to terminate her pregnancy falls within the liberty protection of the Due Process Clause, the Court in *Harris* ruled that:

> it simply does not follow that a woman's freedom of choice carries with it a constitutional entitlement to the financial resources to avail herself of the full range of protected choices. The reason was explained in *Maher* [*v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977)]: although government may not place obstacles in the path of a woman's exercise of her freedom of choice, it need not remove those not of its own creation. Indigency falls in the latter category.... [T]he fact remains that the Hyde Amendment leaves an indigent woman with at least the same range of choice in deciding whether to obtain a medically necessary abortion as she would have had if Congress had chosen to subsidize no health care costs at all. We are thus not persuaded that the Hyde Amendment impinges on the constitutionally protected freedom of choice recognized in [*Roe v.*] *Wade* [410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)].

*Id.* at 316–317, 100 S.Ct. at 2688. The Court also rejected claims based on equal protection and religion. *Id.* at 319–326, 100 S.Ct. at 2689–2693. Appellees suggest that we adopt the reasoning used in *Harris* and conclude that notwithstanding a woman's fundamental right to have an abortion, the state is not required to provide funding to enable the exercise of that right.

Conversely, Appellants maintain that this Court is not bound by the *Harris* decision under the rationale that because the West Virginia Constitution provides more expansive protections to its citizens than the federal constitution, this state's constitutional protections prevail. *See Doe v. Maher*, 40 Conn. Supp. 394, 419, 515 A.2d 134, 147 (1986) ("federal decisional law is not a lid on the protections guaranteed under our state con-

stitution"). As support for this proposition, Appellants cite decisions in seven states which have relied on the greater protections of their respective state constitutions to find abortion-restrictive language in entitlement programs unconstitutional. *See Committee to Defend Reprod. Rights v. Myers*, 29 Cal.3d 252, 625 P.2d 779, 172 Cal.Rptr. 866; *Maher*, 40 Conn.Supp. 394, 515 A.2d 134; *Moe v. Secretary of Admin. & Fin.*, 382 Mass. 629, 417 N.E.2d 387 (1981); *Right to Choose v. Byrne*, 91 N.J. 287, 450 A.2d 925 (1982); *Hope v. Perales*, 189 A.D.2d 287, 595 N.Y.S.2d 948 (1993); *Planned Parenthood Ass'n, Inc. v. Department of Human Resources*, 63 Or.App. 41, 663 P.2d 1247 (1983), *aff'd*, 297 Or. 562, 687 P.2d 785 (1984); *Doe v. Celani*, No. S81–84CnC, (Vt.Super.Ct. May 26, 1986).

▮ Those protections unique to our state constitution as contrasted to the federal constitution are found in sections one, three, and ten of article III. Section one of article III reads:

> All men are, by nature, *equally free and independent*, and have certain inherent rights, of which, when they enter into a state of society, they cannot, by any compact, deprive or divest their posterity, namely: the enjoyment of life and liberty, with the means of acquiring and possessing property, and of pursuing and obtaining happiness and *safety*.

W.Va. Const. art. III, § 1 (emphasis supplied). Nowhere in the United States Constitution are the terms "equally free and independent" or "safety" or comparable rights guaranteed. Similarly, section three of article III provides that: "Government is instituted for the *common benefit*, protection and *security* of the people, nation or community." W.Va. Const. art. III, § 3 (emphasis supplied). The federal constitution is devoid of any language stating that the federal government is instituted for the "common benefit" and "security" of its citizens. Although our due process clause does not significantly differ in terms of its language from the Fifth and Fourteenth Amendments to the federal

442

constitution,[9] this Court has determined repeatedly that the West Virginia Constitution's due process clause is more protective of individual rights than its federal counterpart. *See State v. Bonham,* 173 W.Va. 416, 317 S.E.2d 501 (1984).

In *Bonham,* this Court noted that, "the United States Supreme Court has ... recognized that a state supreme court may set its own constitutional protections at a higher level than that accorded by the federal constitution." 173 W.Va. at 418, 317 S.E.2d at 503 (citing, inter alia, *Connecticut v. Johnson,* 460 U.S. 73, 81 n. 9, 103 S.Ct. 969, 974 n. 9, 74 L.Ed.2d 823 n. 9 (1983)). Based on the principle that " '[t]he provisions of the Constitution of the State of West Virginia may, in certain instances, require higher standards of protection than afforded by the Federal Constitution[,]' Syllabus Point 2, *Pauley v. Kelly,* 162 W.Va. 672, 255 S.E.2d 859 (1979)," we ruled in *Bonham,* that this state's due process clause affords a criminal defendant greater protections than the federal counterpart. 173 W.Va. at 418–19, 317 S.E.2d at 503–04 and Syl. Pt. 1 (holding that imposition of more severe sentence following trial de novo *does* violate defendant's due process rights); *see also West Virginia Citizens Action Group v. Daley,* 174 W.Va. 299, 324 S.E.2d 713 (1984) (state constitution compels striking limitation on soliciting after sunset even if federal constitution does not); *Woodruff v. Board of Trustees of Cabell Huntington Hospital,* 173 W.Va. 604, 611, 319 S.E.2d 372, 379 (1984) (Article III, § 1 "more stringent in its limitation on waiver [of fundamental rights] than is the federal constitution"); *Pushinsky v. West Virginia Board of Law Examiners,* 164 W.Va. 736, 266 S.E.2d 444 (1980) (recognizing that state constitution imposes more stringent limitations on power of state to inquire into lawful associations and speech than those imposed by federal constitution); *Pauley v. Kelly,* 162 W.Va. 672, 707, 255 S.E.2d 859, 878 (1979) (ruling that education is a "fundamental constitutional right"); *see generally* Justice Thomas B. Miller, *The New Federalism in West Virginia,* 90 W.Va.L.Rev. 51 (1987–88).

The provision of enhanced guarantees for "the enjoyment of life and liberty ... and safety" by our state constitution both permits and requires us to interpret those guarantees independent from federal precedent. W.Va. Const. art. III, § 1. Accordingly, we are not bound by federal precedent in interpreting issues of constitutional law arising from these enhanced guarantees. *See Bonham,* 173 W.Va. at 418, 317 S.E.2d at 503. Furthermore, because we are permitted to elevate our constitutional protections, we are similarly free to reject federal precedent such as *Harris. See* 448 U.S. 297, 100 S.Ct. 2671. We do just that today.

Under *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the constitutional basis for granting a woman choice with regard to pregnancy termination is grounded in the "Fourteenth Amendment's concept of personal liberty and restrictions upon state action." *Id.* at 153, 93 S.Ct. at 727. In the most recent United States Supreme Court decision on the issue, the Court reiterated the central premise of *Roe* —that women may, for some time period, make independent decisions to obtain abortions based on the right to privacy. *Planned Parenthood v. Casey,* — U.S. ——, ——––——, 112 S.Ct. 2791, 2811–12, 120 L.Ed.2d 674 (1992). Appellees claim, however, that West Virginia has not recognized a parallel fundamental right to privacy under our state constitution similar to that recognized in *Roe. See* 410 U.S. at 152–53, 93 S.Ct. at 726. Because there is a federally-created right of privacy that we are required to enforce in a non-discriminatory manner, it is inconsequential that no prior decision of this Court expressly determines the existence of an analogous right.

Appellants note that if an indigent woman who is receiving Aid to Families with Dependent Children (AFDC) benefits, receives a gift or donation, earns additional income, or borrows funds to pay for an abortion, that money is required to be reported to the Department of Human Resources ("DHS") and may render the woman ineligible to receive continued benefits. As attested to by

---

**9.** The due process clause provides: "No person shall be deprived of life, liberty, or property, without due process of law...." W.Va. Const. art. III, § 10.

John A. Boles, Jr., the Director of the Office of Income Maintenance within the DHS, even a gift, donation, loan, or extra income in the amount of $333 "would, in most cases, disqualify the recipient for several months." [10] Thus, indigent women who are forced to secure funds to pay for an abortion are, in effect, penalized for the exercise of a constitutional right. Moreover, the penalty is realized not only by the women, but also by their families through the loss of funds which would have been received if not for the exercise of a constitutional right.

Furthermore, Appellants point out that the provisions of West Virginia Code § 9–2–11 necessarily impinge on the health and safety of poor women. To illustrate how the denial of funding for medically necessary abortions impacts negatively on the safety of indigent women, Appellants identify those types of health concerns that may warrant an abortion which are not covered by West Virginia Code § 9–2–11. Specific examples of medical conditions which may necessitate performing an abortion are hypertension which places pregnant women at higher risk for strokes, premature placenta separation, and a severe bleeding disorder. Other medical conditions which may place the mother's health in jeopardy if she continues the pregnancy include gestational diabetes, epilepsy, and phlebitis. In certain instances, as in the case of phlebitis, the drugs used to prevent blood clotting in the lungs are dangerous to the fetus and cannot be administered if the woman is pregnant. In the case of malignant breast tumors, pregnancy may actually accelerate the growth of the tumors. According to the submitted record, many of these problems occur with greater frequency among low-income women.[11]

Given that the term safety, by definition, conveys protection from harm, it stands to reason that the denial of funding for abortions that are determined to be medically necessary both can and most likely will affect the health and safety of indigent women in this state. To deny this conclusion requires

that we similarly deny the reality of being poor. The question then becomes whether this arguable impingement on safety resulting from the provisions of West Virginia Code § 9–2–11 rises to the level of impermissible state action.

The United States Supreme Court explained in *Maher,*

> The Constitution imposes no obligation on the States to pay the pregnancy-related medical expenses of indigent women, or indeed to pay any of the medical expenses of indigents. *But when a State decides to alleviate some of the hardships of poverty by providing medical care, the manner in which it dispenses benefits is subject to constitutional limitations.*

432 U.S. at 469–70, 97 S.Ct. at 2380 (emphasis supplied and footnote omitted). The Court ruled in *Maher* that Connecticut regulations which excluded funding for nontherapeutic abortions did not violate the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 479–80, 97 S.Ct. at 2385–86. The oft-quoted reasoning of the Court in *Maher* was that:

> The Connecticut regulation places no obstacles—absolute or otherwise—in the pregnant woman's path to an abortion. An indigent woman who desires an abortion suffers no disadvantage as a consequence of Connecticut's decision to fund childbirth; she continues as before to be dependent on private sources for the service she desires. The State may have made childbirth a more attractive alternative, thereby influencing the woman's decision, but it has imposed no restriction on access to abortions that was not already there. The indigency that may make it difficult—and in some cases, perhaps impossible—for some women to have abortions is neither created nor in any way affected by the Connecticut regulation.

*Id.* at 474, 97 S.Ct. at 2382–83. Perhaps just as frequently-quoted is Justice Brennan's response to this reasoning:

10. "In order to qualify for AFDC, income and assets are compared to maximum limits which include $1,000 in assets (excluding their home furnishings and $1,500 in equity value in a motor vehicle), and an income less than 26 percent of the Federal Poverty Level." Affidavit of John A. Boles, Jr.

11. *See* affidavit of Ward W. Maxson, M.D.

As a practical matter, many indigent women will feel they have no choice but to carry their pregnancies to term because the State will pay for the associated medical services, even though they would have chosen to have abortions if the State had also provided funds for that procedure, or indeed if the State had provided funds for neither procedure. This disparity in funding by the State clearly operates to coerce indigent pregnant women to bear children they would not otherwise choose to have, and just as clearly, this coercion can only operate upon the poor, who are uniquely the victims of this form of financial pressure.

*Maher*, 432 U.S. at 483, 97 S.Ct. at 2387 (Brennan, J., dissenting). As noted above, the potential denial of AFDC benefits upon borrowing, earning, or receiving funds to pay for an abortion is yet another illustration of how indigent women are coerced by the State to have children which they might otherwise choose not to bear.

■ Appellees strenuously argue that the state is not obligated to pay for the exercise of constitutional rights. While this proposition is true as stated, it is equally true that once a government chooses to dispense funds, it must do so in a nondiscriminatory fashion, and it certainly cannot withdraw benefits for no reason *other* than that a woman chooses to avail herself of a federally-granted constitutional right. *See Maher*, 432 U.S. at 469–70, 97 S.Ct. at 2380; *accord Moe*, 382 Mass. at 654, 417 N.E.2d at 402; *Byrne*, 91 N.J. at 306–07, 450 A.2d at 935. As noted in *Moe*,

the Legislature need not subsidize any of the costs associated with child bearing, or with health care generally. However, once it chooses to enter the constitutionally protected area of choice, it must do so with genuine indifference. It may not weigh the options open to the pregnant woman by its allocation of public funds; in this area, government is not free to 'achieve with carrots what [it] is forbidden to achieve with sticks.'

382 Mass. at 654, 417 N.E.2d at 402 (quoting Lawrence Tribe, *American Constitutional Law*, § 15–10 at 933 n. 77 (1978)).

The concept invoked by selective governmental funding is the issue of government neutrality. We have previously determined that the common benefit clause of article III, section 3 of the West Virginia Constitution imposes an "obligation upon state government ... to preserve its neutrality when it provides a vehicle" for the exercise of constitutional rights. *United Mine Workers v. Parsons*, 172 W.Va. 386, 398, 305 S.E.2d 343, 354 (1983). We characterized article III, section 3 as an "equal protection clause" that serves the goal of "fundamental fairness." *Id.* Under this rationale, we ruled that while there was no constitutional mandate to sell air time to anyone, once West Virginia University sold broadcast time to the coal industry for the presentation of "a politically controversial issue of public concern," the University was required to sell equal air time to the coal miners' union to permit contrasting viewpoints. *Id.* Furthermore, we noted in *Parsons*, that the obligation of the government to act for the "common benefit, protection, and security" of its citizens is "as applicable in the [arena of free speech] ... as it is in any other context." *Id.*

In reliance on *Parsons*, Appellants argue that strict neutrality is mandated whenever state government operates to assist constitutionally-protected decisions. In resolving this same issue of neutrality, the Massachusetts Supreme Court looked to the views Justice Brennan expressed in his dissent to *Harris*:

'In every pregnancy, [either medical procedures for its termination, or medical procedures to bring the pregnancy to term are] medically necessary, and the poverty-stricken woman depends on the Medicaid Act to pay for the expenses associated with [those] procedure[s]. But under [this restriction], the Government will fund only those procedures incidental to childbirth. By thus injecting coercive financial incentives favoring childbirth into a decision that is constitutionally guaranteed to be free from governmental intrusion, [this restriction] deprives the indigent woman of her freedom to choose abortion over maternity, thereby impinging on the due pro-

cess liberty right recognized in *Roe v. Wade*.'

*Moe*, 417 N.E.2d at 402 (quoting *Harris*, 448 U.S. at 333, 100 S.Ct. at 2703–04, Brennan, J. dissenting).

■ Appellants urge this Court to accept the reasoning articulated by Justice Brennan and others that by denying funding for medically necessary abortions while funding childbirth, the state impermissibly pressures women towards a state-approved reproductive choice. The effect of such restrictions is inherently coercive where a woman is too poor to afford appropriate medical care:

> [F]rom a realistic perspective, we cannot characterize the statutory scheme as merely providing a public benefit which the individual recipient is free to accept or refuse without any impairment of her constitutional rights. On the contrary, the state is utilizing its resources to ensure that women who are too poor to obtain medical care on their own will exercise their right of procreative choice only in the manner approved by the state.

*Myers*, 29 Cal.3d at 276, 625 P.2d at 793, 172 Cal.Rptr. at 880. Appellants suggest and we agree that for an indigent woman, the state's offer of subsidies for one reproductive option and the imposition of a penalty for the other necessarily influences her federally-protected choice. Under the rationale announced by this Court in *Parsons*, we hold that when state government seeks to act "for the common benefit, protection and security of the people" in providing medical care for the poor, it has an obligation to do so in a neutral manner so as not to infringe upon the constitutional rights of our citizens. *See* 172 W.Va. at 398, 305 S.E.2d at 354.

■ While Appellees prefer to characterize this case as one involving guarantees of state funding to carry out a protected right, what is really at issue here is "the right of the individual ... [to be] free[ ] from undue government interference, not an assurance of government funding." *Byrne*, 91 N.J. at 307, 450 A.2d at 935 n. 5. Given West Virginia's enhanced constitutional protections, we cannot but conclude that the provisions of West Virginia Code § 9–2–11 constitute undue government interference with the exercise of the federally-protected right to terminate a pregnancy. As we have discussed above, were it not for this state's undertaking to provide medically necessary care to the poor through entitlement programming such as medicaid, it would not be operating in violation of its obligation to act neutrally for the common benefit of its citizens by enacting legislation such as West Virginia Code § 9–2–11, the effect of which is forced compliance with legislated reproductive policy.

■ Having concluded that the provisions of West Virginia are unconstitutional, all that remains is to fashion a remedy. In syllabus point six of *Waite v. Civil Service Commission*, 161 W.Va. 154, 241 S.E.2d 164 (1978) we held that: "[w]here there is an adequate procedural remedy which prevents a statute from being unconstitutionally applied, the Court will, under the doctrine of least obtrusive remedy, adopt such procedure to avoid declaring a statute unconstitutional." *Accord, State ex rel. Harris v. Calendine*, 160 W.Va. 172, 177, 233 S.E.2d 318, 323 (1977); Syl. Pt. 4, *State ex rel. Alsop v. McCartney*, 159 W.Va. 829, 228 S.E.2d 278 (1976). Accordingly, we conclude that that portion of Senate Bill 2 which is West Virginia Code § 9–2–11 is severable from the remainder of Senate Bill 2 under the general severability clause applicable to all statutes, West Virginia Code § 2–2–10(cc) (1990), because there is no provision in any section of chapter nine of the Code which prohibits severability and because the remaining parts of Senate Bill 2 are complete and capable of standing alone.

Based on the foregoing, we hereby reverse and remand the decision of the Circuit Court of Kanawha County for entry of an order reflecting the rulings herein.

Reversed and remanded.

McHUGH, Justice, dissenting:

I dissent from the majority opinion because I believe that a state is not required to provide funding to enable a woman to exercise her right to have an abortion. Like the majority, I agree that the question before the Court "does not turn on the morality or immorality of abortion, and most decidedly

does not concern the personal views of the individual justices as to the wisdom of the legislation itself or the ethical considerations involved in a woman's individual decision whether or not to bear a child." *Committee to Defend Reprod. Rights v. Myers*, 29 Cal.3d 252, 625 P.2d 779, 780, 172 Cal.Rptr. 866, 867 (1981). However, unlike the majority, I conclude that *W.Va.Code*, 9–2–11 [1993] does not violate the *West Virginia Constitution.*

The Supreme Court of Michigan was faced with the same issue in *Doe v. Dept. of Social Services*, 439 Mich. 650, 487 N.W.2d 166 (1992) and concluded that the Michigan Medicaid statute which funded childbirth, but not abortion unless the abortion was medically necessary to save the mother's life, does not violate the equal protection clause in the Michigan Constitution.[1] I find the analysis of the Supreme Court of Michigan to be persuasive. Therefore, I will follow the Supreme Court of Michigan's analysis in my dissent.

As the majority points out and as the Supreme Court of Michigan notes, the Supreme Court of the United States has analyzed this very issue in a series of cases. In *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977) the Supreme Court of the United States upheld a Connecticut statute which limited state funding for abortions to medically necessary abortions performed during the first trimester of pregnancy. In reaching its conclusion the Supreme Court of the United States acknowledged that *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) gave a woman the right under the federal constitution to choose an abortion. However, in *Maher* the Supreme Court of the United States clarified the *Roe* decision:

Roe did not declare an unqualified 'constitutional right to an abortion,'.... Rather, the right protects the woman from unduly burdensome interference with her freedom

to decide whether to terminate her pregnancy. It implies no limitation on the authority of a State to make a value judgment favoring childbirth over abortion, and to implement that judgment by the allocation of public funds.

*Maher*, 432 U.S. at 473–74, 97 S.Ct. at 2382, 53 L.Ed.2d at 494. The Court in *Maher* explained that "[t]here is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." *Id.* at 475, 97 S.Ct. at 2383, 53 L.Ed.2d at 495 (footnote omitted).

In *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), the Supreme Court of the United States held that the Hyde Amendment, which placed federal restrictions on Medicaid funds for abortions except in a limited number of circumstances, did not violate the establishment clause in the First Amendment nor the equal protection clause of the Fifth Amendment of the *United States Constitution.* In reaching its conclusion the Supreme Court of the United States noted that

although government may not place obstacles in the path of a woman's exercise of her freedom of choice, it need not remove those not of its own creation. Indigency falls in the latter category. The financial constraints that restrict an indigent woman's ability to enjoy the full range of constitutionally protected freedom of choice are the product not of governmental restrictions on access to abortions, but rather of her indigency. Although Congress has opted to subsidize medically necessary services generally, but not certain medically necessary abortions, the fact remains that the Hyde Amendment leaves an indigent woman with at least the same range of choice in deciding whether to obtain a medically necessary abortion as she would

1. The Supreme Court of Michigan noted that the relevant language found in § 109a of the Social Welfare Act provides:

'Notwithstanding any other provision of this act, an abortion shall not be a service provided with public funds to a recipient of welfare benefits, whether through a program of medical assistance, general assistance, or categorical assistance or through any other type of

public aid or assistance program, unless the abortion is necessary to save the life of the mother. It is the policy of this state to prohibit the appropriation of public funds for the purpose of providing an abortion to a person who receives welfare benefits unless the abortion is necessary to save the life of the mother.'
M.C.L. § 400.109a; M.S.A. § 16.490(19a).
*Doe*, 487 N.W.2d at 169.

have had if Congress had chosen to subsidize no health care costs at all. *Id.* at 316–17, 100 S.Ct. at 2688, 65 L.Ed.2d at 804 (*citing Maher, supra*).

The Supreme Court of Michigan in *Doe, supra,* discussed the Supreme Court of the United States' equal protection analysis found in *Harris, supra,* and *Maher, supra,* in detail. *Doe* points out that with this issue there are two levels at which an equal protection analysis can take place.[2] Ordinarily, the legislation must be rationally related to a legitimate governmental purpose. However, if the legislation creates a classification which is based on suspect factors or prevents the exercise of a fundamental right, then the legislation must be analyzed with strict scrutiny. This analysis, although ignored by the majority, is not foreign to this Court. *E.g., Gibson v. W.Va. Dept. of Highways,* 185 W.Va. 214, 406 S.E.2d 440 (1991); *Means v. Sidiropolis,* 184 W.Va. 514, 401 S.E.2d 447 (1990); *Courtney v. State Dept. of Health,* 182 W.Va. 465, 470, 388 S.E.2d 491, 496 (1989); and *Israel v. West Virginia Secondary Schools Activities Commission,* 182 W.Va. 454, 388 S.E.2d 480 (1989).

The Supreme Court of the United States determined that strict scrutiny did not apply to the issue. In *Maher,* the Supreme Court of the United States pointed out that "this Court has never held that financial need alone identifies a suspect class for purposes of equal protection analysis." *Maher,* 432 U.S. at 471, 97 S.Ct. at 2381, 53 L.Ed.2d at 492–93 (citations omitted). Furthermore, the Supreme Court of Michigan pointed out that "[t]he United States Supreme Court has held in other cases that a legislature's election not to fund the exercise of a fundamental right

does not impinge upon that right[.]" *Doe,* 487 N.W.2d at 172 (*citing Regan v. Taxation with Representation,* 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) and footnote omitted). Therefore, the Supreme Court of the United States found that the failure to fund abortions did not interfere with an indigent woman's fundamental right to choose an abortion. *See Maher, supra.*

Since strict scrutiny is not applicable, then the legislation needs only to be rationally related to a legitimate governmental interest. As *Doe, supra,* points out, even the *Roe* decision acknowledges that the state does have an " 'important and legitimate interest ... in protecting the potentiality of human life.' " *Id.,* 487 N.W.2d at 173, *citing Roe v. Wade,* 410 U.S. at 162, 93 S.Ct. at 731, 35 L.Ed.2d at 182. In fact, the Supreme Court of the United States

> has emphasized that no burden is imposed upon the government to remain neutral regarding abortion: '[The right recognized in *Roe* ] implies no limitation on the authority of a State to make a value judgment favoring childbirth over abortion, and to implement that judgment by the allocation of public funds.' *Maher,* 432 U.S. at 474, 97 S.Ct. at 2382.

*Id.* Therefore, the Supreme Court of the United States concluded that the legislation which refused to fund abortions except in limited circumstances was rationally related to a legitimate governmental interest. *See Maher, supra,* and *Harris, supra.*

In *Doe, supra,* the court below had found that the Michigan Constitution provided greater protection under its equal protection clause than its federal counterpart. The Su-

---

2. In *Lewis v. Canaan Valley Resorts, Inc.,* 185 W.Va. 684, 691, 408 S.E.2d 634, 641 (1991) this Court pointed out that there are three types of equal protection analyses:

> First, when a suspect classification, such as race, or a fundamental, constitutional right, such as speech, is involved, the legislation must survive 'strict scrutiny,' that is, the legislative classification must be necessary to obtain a compelling state interest.... Second, a so-called intermediate level of protection is accorded certain legislative classifications, such as those which are gender-based, and the classifications must serve an important governmental objective and must be substantially re-

lated to the achievement of that objective.... [H]owever, this 'middle-tier' equal protection analysis is 'substantially equivalent' to the 'strict scrutiny' test stated immediately above....
>
> Third, all other legislative classifications ... are subjected to the least level of scrutiny, the traditional equal protection concept that the legislative classification will be upheld if it is reasonably related to the achievement of a legitimate state purpose.

(citations omitted). Although there are technically three levels of equal protection analyses in West Virginia, in the case before us only two need to be considered.

preme Court of Michigan disagreed and held that the equal protection clause in the state constitution provided the same protection as its federal counterpart and applied the same analysis the United States Supreme Court had to the issue. Like the Supreme Court of Michigan I find that the more sound approach to this issue is to follow the analysis provided by the Supreme Court of the United States.

However, unlike *Doe*, the majority, in the case before us, found that the *West Virginia Constitution* provides greater protection than the *United States Constitution*. The rationale of the majority is that "the common benefit clause of article III, section 3 of the West Virginia Constitution imposes an 'obligation upon state government ... to preserve its neutrality when it provides a vehicle' for the exercise of constitutional rights." *Women's Health Center of West Virginia, Inc. v. Panepinto*, 191 W.Va. 436, 444, 446 S.E.2d 658, 666 (1993) (*citing United Workers v. Parsons*, 172 W.Va. 386, 398, 305 S.E.2d 343, 354 (1983)). Based on the above premise, the majority went on to hold that once the government provides medical care to an indigent woman it must do so in a neutral manner, and that funding childbirth but not abortion in some circumstances was not neutral.

Although not clear, it appears that the majority applied a strict scrutiny analysis. The majority made a two-fold finding. The first is that *W.Va.Code*, 9–2–11 [1993], impinges upon a woman's fundamental right to an abortion since as a practical matter an indigent woman would not have the freedom to choose an abortion. Within this analysis, the majority found that if the government does not equally fund two competing fundamental rights, then it is infringing upon one of those fundamental rights. The second is that *W.Va.Code*, 9–2–11 [1993], infringes upon a woman's fundamental right to safety found in article III, section 1 of the *West Virginia Constitution*.

I recognize that this Court has previously held that the *West Virginia Constitution*, in rare circumstances, affords a higher degree of protection than the *United States Consti-*

*tution* does. However, the case before us does not present a need for such protection. In fact, the majority's adoption of the "neutrality in funding" principle could have a profound adverse impact on the indigent or others who seek government assistance. The frightening effect of the majority's reasoning will be to chill government aid since it would be virtually impossible financially to fund all competing fundamental rights equally.

For instance, in syllabus point 3, in relevant part, of *Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859 (1979) this Court held that an education is a "fundamental, constitutional right in this State." Does this mean that the state government must fund private schools since it funds public schools? If the majority holds to its position, the answer is yes. The majority's reliance on the neutrality in funding principle could logically authorize private religious and non-religious schools to seek and obtain equal funding for the exercise of their fundamental right to education. *Norwood v. Harrison*, 413 U.S. 455, 462, 93 S.Ct. 2804, 2809, 37 L.Ed.2d 723, 729 (1973) points out the difficulties of the majority's position: "It is one thing to say that a State may not prohibit the maintenance of private schools and quite another to say that such schools must, as a matter of equal protection, receive state aid." (*quoted* in *Doe*, 487 N.W.2d at 172).

More importantly, the government has always enacted laws which encourage one right as opposed to a competing right. For instance, many state governments have enacted legislation which benefits marriage. *See Doe, supra* (Levin, J., concurring). However, a person has just as much of a right to choose to be single; yet, governments do not accord the same benefits to the single person as they do to the married couple.

The majority's concept of government neutrality in the case before us would make most government aid or lack thereof unconstitutional:

It will always be possible to argue that an entitlement created by the state promotes one bundle of fundamental rights at the expense of another. A requirement of neutrality would mean that the govern-

ment could create no entitlement without also creating an equal and opposite entitlement. Under such a scheme of government, the role of the judiciary would be to police neutrality in legislation, steadfastly striking down any legislation that expressed an idea, contained a thought, or took a position on the issues that matter most. Only legislation consisting of dull gray matter would survive.

*Doe,* 487 N.W.2d at 185 (Levin, J., concurring).[3] Obviously, this is not what the constitutional framers had in mind when they drafted the state constitution.

Additionally, the safety argument of the majority, based on article III, section 1 of the *West Virginia Constitution,* is without merit. *W.Va.Code,* 9–2–11 [1993], in relevant part, specifically states that funds will be provided for an abortion if a physician determines in his best clinical judgment that there is

(i) A medical emergency that so complicates a pregnancy as to necessitate an immediate abortion to avert the death of the mother or for which a delay will create grave peril of irreversible loss of major bodily function or an equivalent injury to the mother: Provided, That an independent physician concurs with the physician's clinical judgment; or

(ii) Clear clinical medical evidence that the fetus has severe congenital defects or terminal disease or is not expected to be delivered; or

(2) The individual is a victim of incest or the individual is a victim of rape when the rape is reported to a law-enforcement agency.

It is apparent that the legislature did consider the woman's psychological and physiological safety when drafting *W.Va.Code,* 9–2–11 [1993].

Moreover, we have stated that "[a] fact once determined by the legislature, and made the basis of a legislative act, is not thereafter open to judicial investigation." Syl. pt. 4, *State ex rel. W.Va. Housing and*

*Development Fund v. Copenhaver,* 153 W.Va. 636, 171 S.E.2d 545 (1969). In chapter 16 of the *West Virginia Code,* which is entitled "Parental Notification of Abortions Performed on Unemancipated Minors," the legislature found that "the medical, emotional and psychological consequences of abortion are serious and of indeterminate duration, particularly when the patient is immature[.]" *W.Va.Code,* 16–2F–1 [1984], in relevant part. Even though the above legislative finding of fact concerns minors, it is equally applicable to the issue before this Court. Therefore, this Court may not ignore the legislature's determination that abortions may pose a threat to a woman's safety.

Abortion is an emotionally charged issue. Therefore, as long as the government does not interfere with a woman's right to choose an abortion, the decisions regarding the funding for abortions should be left to the legislature. As we have previously stated, "[i]t is not the province of the courts to make or supervise legislation, and a statute may not, under the guise of interpretation, be modified, revised, amended, distorted, remodeled, or rewritten[.]" *State v. General Daniel Morgan Post No. 548, Veterans of Foreign Wars,* 144 W.Va. 137, 145, 107 S.E.2d 353, 358 (1959) (citation omitted). *See also* syl. pt. 1, *Consumer Advocate Division of the Public Service Commission v. Public Service Commission,* 182 W.Va. 152, 386 S.E.2d 650 (1989).

Additionally, this Court has consistently recognized that whenever possible statutes should be found to be constitutional:

'In considering the constitutionality of a legislative enactment, courts must exercise due restraint, in recognition of the principle of the separation of powers in government among the judicial, legislative and executive branches. Every reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legis-

3. The United States Supreme Court has noted that "our cases have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or prop-

erty interests of which the government itself may not deprive the individual." *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 196, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249, 259 (1989).

lative enactment in question. Courts are not concerned with questions relating to legislative policy. The general powers of the legislature, within constitutional limits, are almost plenary. In considering the constitutionality of an act of the legislature, the negation of legislative power must appear beyond reasonable doubt.' Point 1 Syllabus, State ex rel. Appalachian Power Company v. Gainer, 149 W.Va. 740 [143 S.E.2d 351].

Syl. pt. 3, *State ex rel. W.Va. Housing Development Fund, supra.* Whether or not the government should fund abortions and/or childbirth for the indigent woman is a matter of legislative policy. The legislature is the proper forum for debating whether *W.Va. Code,* 9–2–11 [1993] is unwise, not the judiciary. As we recently stated, "the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *Tony P. Sellitti Construction Co. v. Caryl,* 185 W.Va. 584, 593, 408 S.E.2d 336, 345 (1991), *cert. den.,* —— U.S. ——, 112 S.Ct. 969, 117 L.Ed.2d 135 (1992) (*citing City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511, 517 (1976)).

*W.Va.Code,* 9–2–11 [1993] does not trample on a constitutional right. It does not prevent a woman from exercising her fundamental right to choose an abortion. The majority has chosen to cast aside well-established legal principles to reach its conclusion. The holding will have limited precedential value because the majority will not be able to adhere to the result of the neutrality in funding issue when it comes up in other contexts. Accordingly, based on the above discussion, I respectfully dissent. I am authorized to state that Chief Justice Brotherton joins me in this dissent.