IN THE SUPREME COURT OF THE STATE OF ARIZONA
En Banc

| | |
|---|---|
| SIMAT CORP. d/b/a ABORTION SERVICES OF PHOENIX; ARIZONA REPRODUCTIVE MEDICINE & GYNECOLOGY, LTD., ROBERT H. TAMIS, M.D.; FAMILY PLAN-NING ASSOCIATES MEDICAL GROUP; JOEL B. BETTIGOLE, M.D.; DAMON S. RAPHAEL, M.D.; TUCSON WOMAN'S CLINIC; and WILLIAM A. MEYER, JR., M.D., ) ) ) ) ) ) ) ) ) | Arizona Supreme Court No. CV-01-0324-PR Court of Appeals Division One No. 1 CA-CV 00-0334 |
| Plaintiffs-Appellees, ) ) | Maricopa County Superior Court No. CV 99-014614 |
| v. ) ) | |
| ARIZONA HEALTH CARE COST CONTAIN-MENT SYSTEM, and PHYLLIS BIEDESS, in her capacity as Director of AHCCCS, ) ) ) ) | **O P I N I O N** |
| Defendants-Appellants. ) _____) | |

Appeal from the Superior Court in Maricopa County
The Honorable Kenneth L. Fields, Judge
AFFIRMED IN PART AND REMANDED

Opinion of the Court of Appeals, Division One
200 Ariz. 506, 29 P.3d 281 (App. 2001)
VACATED

LaVoy & Chernoff, P.C.                                                    Phoenix
    By:    Christopher A. LaVoy
           Mark D. Chernoff
    - and -
Center for Reproductive Law & Policy                              New York
    By:    Bebe J. Anderson
           Hillary Schwab
Attorneys for Plaintiffs-Appellees Simat Corporation,
Abortion Services of Phoenix; Arizona Reproductive
Medicine & Gynecology, Ltd.; Robert H. Tamis, M.D.;
Family Planning Associates Medical Group; Joel B.
Bettigole, M.D.; Damon S. Raphael, M.D.; Tucson
Woman's Clinic; and William A. Meyer, Jr.

Johnston & Kelly, P.L.C.                                                                    Phoenix
        By:     Logan T. Johnston, III
Attorneys for Defendants-Appellants Arizona Health Care
Cost Containment System and Phyllis Biedess

Paul Benjamin Linton                                                    Northbrook, Illinois
        - and -
Center for Arizona Policy                                                              Scottsdale
        By:     Lynden L. Munsil
                Gary S. McCaleb
Attorneys for Amicus Curiae Members of the
Arizona Legislature

Greenberg Traurig, L.L.P.                                                                   Phoenix
        By:     Leigh Anne Ciccarelli
Attorneys for Amici Curiae Southern Arizona Chapter
of the National Lawyers Guild and Arizona Civil
Liberties Union

Wilmer, Cutler & Pickering                                                    Washington, D.C.
        By:     M. Carolyn Cox
        - and -
Bonnie L. Booden                                                                            Phoenix
Attorneys for Amicus Curiae Southern Arizona
People's Law Center and National Network of
Abortion Funds

---

FELDMAN, Justice

¶1          We granted review to decide whether the state constitution permits the state and the Arizona Health Care Cost Containment System (AHCCCS) to refuse to fund medically necessary abortion procedures for pregnant women suffering from serious illness while, at the same time, funding such procedures for victims of rape or incest or when the abortion is necessary to save the woman's life.

¶2          The court of appeals held that AHCCCS' funding scheme was constitutionally permitted. *Simat Corp. v. Arizona Health Care Cost Containment Sys.*, 200 Ariz. 506, 512 ¶ 20, 29 P.3d 281, 287 ¶ 20 (App. 2001). Having ordered supplemental briefing and heard oral argument, we now conclude, as have the great majority of other states that have considered this question, that insofar as the state

2

scheme permits funding of abortions for one class of pregnant women, the state constitution will not permit it to deny funding for others for whom abortions are medically necessary to save the mother's health.

¶3         We are aware, of course, of the controversy surrounding any issue pertaining to abortion. We therefore think it appropriate to state what this case is *not* about. It is not about the right to an abortion. The right to choose was established by the United States Supreme Court in *Roe v. Wade*, 410 U.S. 113, 152-53, 93 S.Ct. 705, 726-27 (1973). It is not about whether the Arizona Constitution provides a more expansive abortion choice than the federal constitution — that issue is not presented. It is not about whether the state must fund abortions for non-therapeutic or contraceptive purposes or, for that matter, any purpose — those issues are not presented. The narrow and only question decided is this: Once the state has chosen to fund abortions for one group of indigent, pregnant women for whom abortions are medically necessary to save their lives, may the state deny the same option to another group of women for whom the procedure is also medically necessary to save their health?

## FACTS

¶4         Appellees (the doctors) are providers of medical services, including abortions, in the field of obstetrics and gynecology. AHCCCS is a state agency that provides Medicaid services to qualified Arizona women with incomes at or below 140 percent of the federally set poverty level. Each of the doctors is a provider to AHCCCS patients, among others. All of the doctors have and have had patients suffering from medical conditions that are serious but not immediately life-threatening. To treat many of these conditions, an abortion must be performed before the necessary therapy can be administered. An example is cancer, for which chemo- or radiation therapy ordinarily cannot be provided if the patient is pregnant, making an abortion necessary before proceeding with the recognized medical treatment. Other conditions for which the administration of drug or other therapy regimens must at times be suspended during pregnancy include heart disease, diabetes, kidney disease, liver disease, chronic renal failure, asthma, sickle cell anemia, Marfan's syndrome, arthritis, inflammatory bowel disease, gall

3

bladder disease, severe mental illness, hypertension, uterine fibroid tumors, epilepsy, toxemia, and lupus erythematosus. In many of the women suffering from these diseases, suspension of recognized therapy during pregnancy will have serious and permanent adverse effects on their health and lessen their life span.[1]

¶5    AHCCCS will not fund abortion services unless the procedure "is necessary to save the life of the woman having the abortion." A.R.S. § 35-196.02. AHCCCS will, however, fund abortion services for victims of rape or incest. *See* AHCCCS Medical Policy Manual, Ch. 400 - Medical Policy for Maternal and Child Health, Policy 410 - Maternity Care Services. The regulations are broader than the statute but required by federal law as a condition of obtaining federal funds. AHCCCS does not challenge the validity of the regulations.

**PROCEDURAL BACKGROUND**

¶6    The doctors' complaint asked for declaratory and injunctive relief on the grounds that the funding policy that prevents medically necessary abortions for AHCCCS patients violates various provisions of the Arizona Constitution. Among these are the privacy clause (art. II, § 8), the due process clause (art. II, § 4), and the equal privileges and immunities clause (art. II, § 13). The doctors and

---

[1] We do not pretend to any special medical training or expertise. Because summary judgment was granted, the record does not indicate the extent to which abortion may be required but unavailable to address serious diseases that, the parties agree, threaten the health of some pregnant women. A moment's thought enables one to reach certain assumptions about cancer therapy. A moment's research reveals, for instance, that lupus may be safely treated without abortion in many if not most cases but is a serious complication in women whose disease becomes active during pregnancy. *See Lupus: A Patient Care Guide For Nurses and Other Health Professionals, Patient Information Sheet #11, Pregnancy and Lupus,* THE NATIONAL INSTITUTE OF ARTHRITIS AND MUSCULOSKELETAL AND SKIN DISEASES, *available at* http://www.niams.nih.gov/hi/topics/lupus/lupusguide/chppis11.htm (January 26, 1999).

Marfan's syndrome is a disease that enlarges the heart and is a serious complication for pregnant women. How well pregnancy may be tolerated evidently depends on the degree of aortic enlargement. If the root of the aorta is greatly enlarged, the risk of maternal and fetal death approaches fifty percent. *See* Denise M. Chism and the RGA Publishing Group, THE HIGH-RISK PREGNANCY SOURCEBOOK, *available at* http://my.webmd.com/content/article/1680.51819 (copyright 1998).

the state filed cross-motions for summary judgment.  The trial judge denied the state's motion and granted the doctors' motion.  He enjoined AHCCCS from enforcing A.R.S. § 35-196.02 in cases in which the abortion procedure was medically necessary to protect the health of the mother and ordered the state to fund medically necessary abortions to the same extent it funds other services for pregnant women.  Minute Entry, May 19, 2000, at 5.

¶7          In reaching this result, the judge first noted that the doctors did not claim their patients had a right to state-funded abortions, but stated that once the state did fund necessary medical care for indigents, the Arizona Constitution required it to do so in a neutral manner.  *Id*. at 2.  The judge then noted that in the case of abortions, AHCCCS uses "completely different standard[s] of medical necessity."  *Id*. at 3.  Instead of the general definition of certification that services are medically necessary, for abortion procedures there must be certification that the pregnancy is the product of rape or incest or is necessary to save the life of the woman.  *Id*.; AHCCCS Medical Policy Manual, *supra*.  The judge therefore found the AHCCCS program is not neutral with respect to reproductive choice and its policy violates fundamental rights under Arizona's constitution.  Minute Entry at 5.

¶8          The judge concluded that under our case law, the privacy clause, article II, § 8, gives each Arizona woman the fundamental right to decide on her "own plan of medical treatment."  *Id*. at 4 (citing *Rasmussen v. Fleming*, 154 Ariz. 207, 215, 741 P.2d 674, 682 (1987)).  Thus, the judge determined, statutes or agency regulations that impair or infringe on such rights must be examined with strict scrutiny and can be upheld only when essential to serve a compelling state interest.  *Id.* Finding that the state had not established that it had "a compelling State interest that must be advanced by endangering indigent women" through denial of medical treatment necessary to preserve their health, the judge held the statutory and regulatory provisions at issue unconstitutional.  *Id*. at 4-5.

¶9          The court of appeals reversed, holding that the statutory scheme does not violate any Arizona constitutional provision, and remanded the case to the superior court for entry of summary judgment in favor of the state.  *Simat Corp.*, 200 Ariz. at 512 ¶ 20, 29 P.3d at 287 ¶ 20.  The court relied on *Harris v. McRae*, a case in which the United States Supreme Court upheld the constitutionality

5

of the so-called Hyde Amendment, a statute that prohibits the use of federal funds under the Medicaid program of Social Security to reimburse states for the cost of abortions. 448 U.S. 297, 322, 100 S.Ct. 2671, 2691 (1980). The Hyde Amendment contains exceptions to the prohibition that are similar to but somewhat broader than those contained in A.R.S. § 35-196.02. The exceptions are when the mother's life "would be endangered" if the abortion were not performed and when the "procedures [are] necessary for the victims of rape or incest. . . ." Pub.L. 96-123 § 109, 93 Stat. 923 (1979).

## BACKGROUND

¶10  In *McRae,* the Supreme Court held that the states participating in the Medicaid system were not required by federal law to fund therapeutic abortions for which federal reimbursement was unavailable because of the Hyde Amendment. 448 U.S. at 309-10, 100 S.Ct. at 2684. This holding, of course, applies to Arizona. Nothing in the federal law requires Arizona to fund abortions other than in accordance with the Medicaid statutes and regulations, as modified by the Hyde Amendment.

¶11  The Supreme Court then held that the Hyde Amendment's funding restrictions did not violate a patient's right of choice as described in *Roe* or the religion clauses of the First Amendment. *Id*. at 315-19, 100 S.Ct. at 2687-89. We reach the same result under the Arizona Constitution. Whatever right of choice may be provided by our constitution is irrelevant to the issue here. Even if our state constitution gives our citizens a right of choice, it certainly does not give them the right to have the government fund those choices.

¶12  The more serious constitutional challenge in *McRae* was the question of equal protection. The *McRae* Court found no violation of the equal protection clause because there was no substantive constitutional right impaired by the Hyde Amendment's funding restrictions. The right, recognized in *Roe*, to choose abortion was left unimpaired because Medicaid patients were free to make that choice. They were only deprived of the ability to require the government to fund their choice, and this, the Court said, did not deprive patients of a substantive, fundamental constitutional right. *Id*. at 325-26, 100 S.Ct. at 2692-93. Because indigency was not a suspect class, there was no discriminatory effect

6

that would require strict scrutiny. *Id*. at 323-24, 100 S.Ct. at 2691-92. Thus, the Court applied the rational relationship test to the provisions of the Hyde Amendment and found that its restrictions were rationally related to the government's legitimate interest in protecting potential life. *Id.* at 325, 100 S.Ct. at 2692.

## DISCUSSION

### A.    Arizona Constitution – privacy rights and equal protection

¶13    We do not believe that *McRae* is dispositive of the issue that arises under the Arizona Constitution. Unlike the federal constitution, our constitution confers an explicit right of privacy on our citizens. *See* Ariz. Const. art. II, § 8 ("No person shall be disturbed in his private affairs . . . ."). Further, the Arizona Constitution expressly prohibited the legislature from denying to some citizens those privileges granted to others. *See* Ariz. Const. art. II, § 13 ("No law shall be enacted granting to any citizen [or] class of citizens . . . privileges or immunities which, upon the same terms, shall not equally belong to all citizens."). Our court of appeals addressed privacy, noting that nothing "in Article 2, § 8 suggests that the framers of the Arizona Constitution intended the right to privacy . . . to create a right of Arizona citizens to subsidized abortions . . . ." *Simat Corp*., 200 Ariz. at 510 ¶ 10, 29 P.3d at 285 ¶ 10. This statement is certainly inarguable, and we do *not* hold that Arizona's right of privacy entitles citizens to subsidized abortions.[2]

_____

[2] However, we have found that our citizens have rights under that clause to care for their health and to choose or refuse the treatment they deem best for themselves. *Rasmussen*, 154 Ariz. at 215, 741 P.2d at 682 (the "individual's right to chart his or her own plan of medical treatment deserves as much, if not more, constitutionally-protected privacy than does an individual's home or automobile."). In *Rasmussen*, we found that the constitutional right given by article II, § 8 to control one's course of medical treatment allowed a person in a chronic vegetative state to choose suspension of treatment and death over continued life; the state could therefore not prevent the exercise of that right. 154 Ariz. at 217, 741 P.2d at 684. This is a right not found, or at least not yet found or recognized, under federal law. *But see Doe v. Bolton*, 410 U.S. 179, 213, 93 S.Ct. 739, 755 (1973) (Douglas, J., concurring and urging constitutional protection for "freedom to care for one's health and person").

¶14    This case arose because the legislature chose to provide medically necessary treatment to one class of pregnant citizens and to withhold medically necessary treatment from another class of pregnant citizens. While a woman who requires chemotherapy for breast cancer may have no right to have the state finance the cost of such therapy, she does have the right to have the state treat her in a neutral manner as compared to the manner in which it treats others in the same class. AHCCCS provides "medically necessary" health care to those who meet stringent standards to qualify for state-provided services. A.R.S. §§ 36-2901(4), 36-2907(A). The question we must answer is whether the state, once it undertakes to provide medically necessary treatment to AHCCCS patients, can deny such treatment to one group of patients simply because they choose to exercise a constitutionally protected right. To state the issue is to answer it. Having undertaken to provide medically necessary health care for the indigent, the state must do so in a neutral manner.

### B.    Disparate treatment – level of scrutiny

¶15    We have long recognized that our equal privileges and immunities clause, article II, § 13, allows the government to enact discriminatory legislation so long as the burden on the affected class may be justified. With us, as with the equal protection analysis used by the United States Supreme Court, the degree of justification required depends, of course, on the nature of the right burdened. In the usual case, legislative regulation that results in disparate treatment of an affected class is upheld so long as there is a legitimate state interest to be served and the legislative classification rationally furthers that interest. *Kenyon v. Hammer*, 142 Ariz. 69, 78, 688 P.2d 961, 970 (1984). A second level of scrutiny is occasionally required, however, for discriminatory regulations that affect classifications such as those based on gender and illegitimacy of birth. To uphold statutes under this test, a court must find the interest served by governmental action is important and the means adopted to achieve the state's goals are reasonable, not arbitrary, and have a fair relation to those goals. *Id*.; *see also State v. Gray*, 122 Ariz. 445, 447, 595 P.2d 990, 992 (1979); *Church v. Rawson*, 173 Ariz. 342, 349, 842 P.2d 1355, 1362 (App. 1992). Finally, when the right that is to be affected is considered fundamental or the class

8

affected is suspect, discriminatory regulation will be upheld only if there is a compelling state interest to be served and the regulation is necessary and narrowly tailored to achieve the legislative objective. *Kenyon*, 142 Ariz. at 78-79, 688 P.2d at 970-71.

**¶16** The regulation in question discriminates between two classes of women: those who require recognized and necessary medical treatment to save their lives and those who require such treatment to save their health and perhaps eventually their lives. Arizona citizens enjoy a fundamental right to choose abortion, a right settled by the United States Supreme Court under the federal constitution. Our citizens also enjoy a right to equal treatment under our own constitution. When the right in question is fundamental, our constitution requires that a strict scrutiny analysis be applied. *Kenyon*, 142 Ariz. at 79, 688 P.2d at 971; *Arizona Downs v. Arizona Horsemen's Found.*, 130 Ariz. 550, 555, 637 P.2d 1053, 1058 (1981); *see also Hunter Contracting Co. v. Superior Court*, 190 Ariz. 318, 320, 947 P.2d 892, 894 (App. 1997). Thus, A.R.S. § 35-196.02 can be upheld only if it serves a compelling state interest and is narrowly tailored and necessary to achieve that interest.

## C.    Compelling state interest

**¶17** The compelling interest advanced by the state and the legislative amici is the state's legitimate interest in preserving and protecting potential life and promoting childbirth. We agree that the state has such an interest. So, too, did the court of appeals in holding there was a rational basis for the statutory scheme because the state has a "legitimate interest in protecting unborn life and promoting childbirth." *Simat Corp.*, 200 Ariz. at 512 ¶ 18, 29 P.3d at 287 ¶ 18.

**¶18** The court of appeals applied only the rational basis test because, in part, it concluded that Arizona's statutory scheme "is not predicated on a constitutionally suspect classification" and the right affected is not fundamental. *Id*. at 511 ¶ 18, 29 P.3d at 286 ¶ 18. In reaching the latter conclusion, the court relied on a United States Supreme Court decision holding that the Hyde Amendment's restrictions did not impinge on a fundamental right because it saw no impairment of the "fundamental right [to abortion] recognized in *Roe* [*v. Wade*]." *Maher v. Roe*, 432 U.S. 464, 474, 97 S.Ct. 2376, 2383 (1977).

9

*McRae* was decided on the same basis. 448 U.S. at 317, 100 S.Ct. at 2688. The appeals court also determined that *Rasmussen* and the privacy rights of article II, § 8 controlled the decision in this case. At least for now we will put aside that analysis.

**¶19** The court of appeals relied on a portion of *Maher* in which the Supreme Court held that when the state adopted restrictions similar to Arizona's, it had only "made childbirth a more attractive alternative, thereby influencing the woman's decision . . . ." *Id.* at 511 ¶ 12, 29 P.3d at 286 ¶ 12 (quoting *Maher*, 432 U.S. at 474, 97 S.Ct. at 2383). We do not agree with this view. The state has undertaken to provide necessary medical services for indigent women and therefore provide care for both serious illness and pregnancy. Thus, pregnant women may receive needed prenatal care; women suffering from cancer or other serious conditions may receive such care for those conditions as proper medical standards may require; but some pregnant women may receive neither because the state has decided that its interest in promoting childbirth takes precedence over the need to save a woman's health. Given the Hyde-like restrictions embodied in A.R.S. § 35-196.02, we believe the state has done much more than make childbirth a more attractive alternative. For many women, childbirth cannot be an attractive alternative in such a predicament. Having undertaken to provide necessary medical care for pregnant women, the state has withheld care from one class of women who need it badly, while at the same time providing such care — prenatal and therapeutic — to others, some of whom who are not in the dire predicament of the women here in question. We are asked to uphold this disparate treatment under a constitutional provision that prohibits the enactment of any law "granting to any citizen, class of citizens, . . . privileges . . . which, upon the same terms, shall not equally belong to all citizens . . . ." Ariz. Const. art. II, § 13.

**D.    Resolution**

**¶20** It is at this point that we conclude that the laws in question cannot survive strict scrutiny. While the state certainly has a legitimate interest in protecting the fetus and promoting childbirth, we cannot see how that is any more compelling than the state's interest in protecting the health of pregnant women afflicted with serious disease by treating health problems before they become terminal. Promoting

childbirth is a legitimate state interest, but it seems almost inarguable that promoting and actually saving the health and perhaps eventually the life of a mother is at least as compelling a state interest. The Supreme Court, in fact, held that the state's interest in promoting childbirth is not even compelling until the fetus is viable. *Roe*, 410 U.S. at 165-66, 93 S.Ct. at 733.

¶21 In cases subsequent to *McRae*, moreover, the United States Supreme Court has recognized that the state has a compelling interest in preserving the health of expectant mothers, so that state restrictions on abortions must give way to the state's interest in preserving the health of pregnant women. *Planned Parenthood v. Casey*, 505 U.S. 833, 846, 112 S.Ct. 2791, 2804 (1992) (plurality opinion). The Court held that while the state's interest in protecting potential life is strong after fetal viability, even then it must give way to the more compelling interest of protecting a woman's health. *Id*. at 872, 100 S.Ct. at 2817-18.

¶22 The Court recently went even further, holding unconstitutional a state prohibition on second trimester "partial birth abortion." *Stenberg v. Carhart*, 530 U.S. 914, 120 S.Ct. 2597 (2000). The statute allowed such abortions when "necessary to save the life of the mother . . . endangered by . . . illness" but contained no such exception for situations in which the mother's health was endangered. *See* Neb.Rev.Stat.Ann. § 28-328(1) (Supp. 1999). The Court found the statute unconstitutional for lack of "any exception 'for the preservation of the . . . health of the mother.'" *Stenberg*, 530 U.S. at 930, 120 S.Ct. at 2609 (quoting *Casey*, 505 U.S. at 837, 112 S.Ct. at 2799). These cases, of course, do not touch on the state's funding obligation, but they do unequivocally express the Supreme Court's view as to the state's compelling interest in preserving women's health. It is a view that we would share even without *Casey* and *Stenberg*.[3]

_____

[3] We cannot explain the decision in *Harris*, on which the dissent relies. It is difficult to reconcile that decision with the basic teaching of *Roe v. Wade*, and we question that *Harris* could survive the more recent opinions in *Stenberg*, *Casey*, and *Hodgson v. Minnesota*, 497 U.S. 417, 110 S.Ct. 2926 (1990). Whereas *Stenberg* was invalidated because a statute permitted an exception only for the life, but not the health, of the mother, the AHCCCS regulations and A.R.S. § 35-196.02 do not simply *lack* a health-preservation exception, they actually *remove* the state's health-preservation obligation for one category of AHCCCS patients. In any event, regardless of the Supreme Court's interpretation

¶23        Refusing abortions and thus preventing administration of the needed therapy for seriously ill women may promote childbirth and protect the fetus, but in some cases it will undoubtedly destroy the health and perhaps eventually the life of the mother. In such a situation, the state is not simply influencing a woman's choice but actually conferring the privilege of treatment on one class and withholding it from another. Under the circumstances presented in this case, we cannot find any compelling interest in so doing. Surely, a woman's right to choose preservation and protection of her health, and therefore, in many cases, her life, is at least as compelling as the state's interest in promoting childbirth. The restrictions in the AHCCCS funding scheme thus not only endanger the health of women being treated in their program but prevent those women from choosing a medical procedure, abortion, when necessary to preserve their health.

¶24        The state would perhaps have a better case if it withheld funding for all abortions. But, given the right of choice announced in *Roe*, once the state allows abortion funding if immediately necessary to save the mother's life, the state's interest in promoting childbirth cannot be considered sufficiently compelling to justify refusing to protect the health of a seriously ill woman. It can justify the distinction in classifications and privileges even less when the law allows abortion of a healthy fetus when the pregnancy results from rape or incest, even though in many cases that mother's life or physical health may not be endangered by carrying the pregnancy to term.

¶25        Thus, we conclude that the laws and regulations in question violate the provisions of article II, § 13 of the Arizona Constitution, which prohibit the enactment of any law granting any citizen privileges that shall not on the same terms "equally belong to all citizens." Because this answer is so clear, we do not reach the question of whether the greater privacy right contained in article II, § 8 of Arizona's constitution would yield the same result. *See* ¶ 13, *supra*. In reaching the conclusion we do today, we do not intimate that the state may not have valid reasons for discriminating in the type of medical treatment provided AHCCCS patients. We hold only that it must justify such discrimination.

of the federal constitution, we are bound by oath and obligation to examine our own state constitution.

12

The only justification advanced here — and none other is apparent to us — is protection of the fetus and promotion of childbirth. But as we have said, this cannot be considered so compelling as to outweigh a woman's fundamental right to choose and the state's obligation to be even-handed in the design and application of its health care policies.

### E.     Holdings in other states

**¶26**        Given the issue before us, it is important, we think, to test our conclusions by considering the views of other states. Courts in at least twenty other states have considered questions of public funding of a medically necessary abortion and have made decisions based on the law of their state. Fifteen of those courts have refused to follow *McRae,* deciding that statutes or constitutions in their state provided protections that required them to invalidate restrictions similar to the Hyde Amendment and to reject *McRae.*[4] Some of those decisions are not published or are at a local trial court level.[5] They are therefore not cited as precedents here although they have been by other courts. *See, e.g., Low-Income Women v. Bost*, 38 S.W.3d 689, 696 (Tex.App. 2000) (*review granted* Aug. 23, 2001). We do not feel a survey of each of those cases is needed to support our conclusion, but a brief discussion of published opinions is helpful.[6] One court noted the tendency of finding state constitutional and statutory

---

[4] In addition to the seven cases mentioned in the text of this section, see *Roe v. Harris*, No. 96977 (Idaho Dist. Ct. Feb. 1, 1994), *result approved by* 917 P.2d 403, 405 (Idaho 1996); *Clinic for Women, Inc. v. Humphreys*, No. 49D12-9908-MI-1137 (Ind.Super.Ct. Oct. 18, 2000), *review granted sub nom. Hamilton v. Clinic for Women, Inc.* (2001); *New Mexico Right to Choose/NARAL v. Johnson*, 975 P.2d 841 (N.M. 1998), *cert. denied*, 526 U.S. 1020, 119 S.Ct. 1256 (1999); *Planned Parenthood Ass'n v. Dep't of Human Resources*, 663 P.2d 1247 (Or.App. 1983); *Women's Health Ctr. v. Panepinto*, 446 S.E.2d 658 (W.Va. 1993).

[5] The following unpublished opinions reached the same results: *Jeannette R. v. Ellery*, No. BDV-94-811 (Mont. Dist.Ct. May 26, 1994); *Doe v. Celani*, No. S81-84CnC (Vt.Super.Ct. May 26, 1986).

[6] Unpublished cases were cited in briefs filed in this court and in the lower court. While we have taken judicial notice of the decisions in those cases only for the purpose of thoroughness, we remind counsel of Rule 28(c), Ariz.R.Civ.App.P., that provides in part, "Memorandum decisions shall not be regarded as precedent nor cited" except in certain circumstances not relevant in this case. A memorandum decision is "a written disposition of a case not intended for publication." Rule 28 (a)(2),

rights on these issues even though *McRae* found none.

> The majority of states that have examined similar Medicaid funding restrictions have determined that their state statutes or constitutions offer broader protection of individual rights than does the United States Constitution and have found that medically necessary abortions should be funded if the state also funds medically necessary expenses related to childbirth.

*Id.*

**¶27**    The Minnesota Supreme Court described the question it saw and defined it sharply:

> The relevant inquiry, then, is whether, having elected to participate in a medical assistance program, the state may selectively exclude from such benefits otherwise eligible persons solely because they make constitutionally protected health care decisions with which the state disagrees.

*Women of State of Minn. by Doe v. Gomez*, 542 N.W.2d 17, 28 (Minn. 1995).

**¶28**    Commenting on a state argument that it has a compelling interest in prospective or potential life that justified the funding ban on abortions for indigent women whose lives were not in immediate danger, the New Jersey Supreme Court said:

> Although that is a legitimate state interest, at no point in a pregnancy may it outweigh the superior interest in the life *and health* of the mother. Yet the funding restriction gives priority to potential life at the expense of maternal health. From a different perspective, the statute deprives indigent women of a governmental benefit for which they are otherwise eligible, solely because they have attempted to exercise a constitutional right.

*Right to Choose v. Byrne*, 450 A.2d 925, 935 (N.J. 1982) (citations and quotations omitted) (emphasis added).

**¶29**    That same general health concern was echoed by the Connecticut Supreme Court when it held a right to abortion was covered by that state's right to privacy and said:

> This right to privacy also encompasses the doctor-patient relationship regarding the woman's health, including the physician's right to advise the woman on the abortion decision based upon her well-being. Finally, the right to make decisions which are necessary for the preservation and protection of one's health, if not covered within the realm of privacy,

---

Ariz.R.Civ.App.P. Our court of appeals discussed memorandum decisions and said, "We find no reason for out-of-state memorandum decisions to be more citable than in-state memorandum decisions." *Walden Books Co. v. Dep't of Revenue*, 198 Ariz. 584, 589 ¶ 23, 12 P.3d. 809, 814 ¶ 23 (App. 2000).

stands in a separate category as a fundamental right protected by the state constitution.

*Doe v. Maher*, 515 A.2d 134, 150 (Conn. 1986) (citations omitted).

**¶30**        The Alaska Supreme Court measured a statute similar to ours against its state's equal protection clause:

> [A] woman who carries her pregnancy to term and a woman who terminates her pregnancy exercise the same fundamental right to reproductive choice. Alaska's equal protection clause does not permit governmental discrimination against either woman; both must be granted access to state health care under the same terms as any similarly situated person.

*State v. Planned Parenthood of Alaska, Inc.*, 28 P.3d 904, 913 (Alaska 2001).

**¶31**        In 1981 Massachusetts was one of the earliest states to consider public funding of abortion. We agree with the Supreme Judicial Court's holding:

> [T]he Legislature need not subsidize any of the costs associated with child bearing, or with health care generally. However, once it chooses to enter the constitutionally protected area of choice, it must do so with genuine indifference. It may not weigh the options open to the pregnant woman by its allocation of public funds; in this area, government is not free to "achieve with carrots what (it) is forbidden to achieve with sticks."

*Moe v. Secretary of Administration & Finance*, 417 N.E.2d 387, 402 (Mass. 1981) (quoting LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 15-10, at 933 n.77 (1978)).

**¶32**        Later that same year, when the California Supreme Court held funding bans were unconstitutional, the court asked rhetorically:

> If the state cannot directly prohibit a woman's right to obtain an abortion, may the state by discriminatory financing indirectly nullify that constitutional right? Can the state tell an indigent person that the state will provide him with welfare benefits only upon the condition that he join a designated political party or subscribe to a particular newspaper that is favored by the government? Can the state tell a poor woman that it will pay for her needed medical care but only if she gives up her constitutional right to choose whether or not to have a child?

*Committee to Defend Reproductive Rights v. Myers*, 625 P.2d 779, 798 (Cal. 1981).

**¶33**        Because state constitutions and state statutes vary, the reasons for striking down abortion funding bans also vary. The principle on which the ban was overturned in the various states thus stemmed

from privacy rights, due process, equal protection, statutory language, and in some cases from the state's Equal Rights Amendment. However, there was consistency in the view that funding bans that discriminate against abortions medically necessary only to preserve the health of indigent women were unsustainable once the state had undertaken to provide medically necessary care.

## COMMENTS ON THE DISSENT

¶34        The nature of this case makes it necessary to comment on several points raised in the dissent. First, the dissent believes the state would treat an abortion necessary to save the health of a pregnant woman suffering from a disease such as cancer the same as an abortion necessary to save the life of a woman. Dissent at ¶ 53. One would hope that the dissent is correct on this point, but we proceed on the contrary premise because the state has not asserted such an argument but instead argues that the distinction is valid. The trial judge granted summary judgment in favor of the doctors, and the court of appeals reversed, ordering summary judgment in favor of the state; thus, there is no record from which to determine how AHCCCS applies A.R.S. § 35-196.02 in practice. Because AHCCCS has not argued that an abortion necessary to save a woman's health is, in many cases, also necessary to save her life, we must presume it is not applying the statute in that manner.

¶35        Second, the dissent assumes this opinion holds that the Arizona Constitution provides a greater right of choice than that provided by the United States Constitution. Dissent at ¶ 55. We reach no conclusion about whether the Arizona Constitution provides a right of choice, let alone one broader than that found in the federal constitution. We need not address the question because Arizona's citizens, like those of other states, are entitled to assert the right to choose as defined and articulated by the United States Supreme Court.

¶36        Third, citing *Maher*, the dissent questions "whether the Arizona constitution requires payment for medically necessary abortions." Dissent at ¶ 50; *see also* ¶¶ 47, 55. But this is not the point. Whether or not it is required to do so, *Arizona has decided to fund abortions*. Having made such decision, the question put to us is whether the Arizona Constitution permits the state to distinguish

16

between those women for whom an abortion is necessary to save their life and those for whom it is medically necessary to save their health and thus prolong their life. Applying strict scrutiny to the fundamental right to choose, we must conclude that the state's legitimate interest in promoting childbirth is not so compelling as to permit it to effectively destroy an indigent woman's opportunity to choose to take medically necessary steps to preserve her health.

¶37 Finally, the dissent is concerned that today's decision will require AHCCCS to provide "greatly expanded medical care" to all AHCCCS patients. Dissent at ¶ 52 n.4. This opinion does not so hold. We only hold that the state cannot deprive a woman of the right of choice by conditioning the receipt of benefits upon a citizen's willingness to give up a fundamental right.

## CONCLUSION

¶38 The issue, and the answer, become clear if we reverse the current rule to suppose an AHCCCS rule that provides state care for an abortion necessary to save a woman's life but denies medically necessary care to a woman who elects to continue a pregnancy. That rule could no more withstand scrutiny than can the current rule that denies coverage for medically necessary abortion when the state provides that standard of care to women who continue a pregnancy.

¶39 The court of appeals' opinion is therefore vacated. The trial court's judgment is affirmed insofar as it precludes application of A.R.S. § 35-196.02 to situations in which therapeutic abortions are medically necessary to enable doctors to administer treatment necessary to address serious health problems of pregnant AHCCCS patients.

¶40 The trial judge also required that AHCCCS fund medically necessary abortions to the same extent that it funds other pregnancy-related services. We believe this requirement is too broad insofar as it might be interpreted to require funding of abortions for non-therapeutic reasons or when not medically necessary to address a pregnant woman's serious health issues.

¶41 Our decision is entirely based on the Arizona Constitution and Arizona cases interpreting the relevant provisions of that constitution. Federal cases are cited only for illustrative or comparative

17

purposes and have not been relied on in reaching our conclusions. *See Michigan v. Long*, 463 U.S. 1032, 1040-41, 103 S.Ct. 3469, 3476 (1983). Even though our decision is rooted in our own constitution, we feel it is important to note that our decision puts Arizona firmly with the majority of states that have considered the issue of the treatment of women who experience the unfortunate coinciding circumstances of being both indigent and ill while pregnant.

¶42   The case is remanded to the trial court for further proceedings consistent with this opinion.


                   _____
                   STANLEY G. FELDMAN, Justice


CONCURRING:


_____
RUTH V. McGREGOR, Vice Chief Justice


_____
THOMAS A. ZLAKET, Justice (retired)


**B E R C H**, Justice, dissenting

¶43   I respectfully dissent.

¶44   The question before this court is whether a state statute is unconstitutional. In deciding such questions, we usually indulge the presumption that state statutes are constitutional, *see Republic Inv. Fund I v. Town of Surprise*, 166 Ariz. 143, 148, 800 P.2d 1251, 1256 (1990), and construe ambiguous statutes, if possible, so as to harmonize them with the constitution. *Schecter v. Killingsworth*, 93 Ariz. 273, 282, 380 P.2d 136, 142 (1963).

¶45   The statute at issue here has not been construed by the courts of this State. The majority opinion assumes that the conditions listed in ¶ 4 of this opinion, if left untreated for the duration of a pregnancy, will not jeopardize the mother's life, and therefore abortion procedures to terminate the

pregnancies that impede treatment for those conditions would not be covered by AHCCCS. It seems clear to me that, if confronted by specific fact situations, the court may well find several of the procedures covered, specifically in those situations in which failure to treat the condition jeopardizes the mother's life, even if not immediately.[1] If this question is in doubt, this court should refrain from engaging in a constitutional adjudication on this less than fully developed record.

¶46    Even assuming, however, that the statute would not allow funding for abortions to allow treatment for some of the conditions referenced in ¶ 4, I have still another point of divergence with the majority position: The question before us has been resolved by the United States Supreme Court, as respects the federal constitutional claims, in a manner adverse to Plaintiffs' position. Thus, unless the Arizona Constitution compels payment for the abortion procedures in question, the State need not fund them. The majority concludes that the Arizona Constitution does compel the State to fund this medical procedure. I do not agree.

¶47    Because Arizona courts have always followed the United States Supreme Court's equal protection and due process analysis,[2] the court of appeals relied upon that Court's analyses in *Harris* and *Maher* of issues similar to the one now before us. In *Harris v. McRae*, 448 U.S. 297 (1980), the Court held that a federal statute prohibiting states from using federal funds for abortions, except to protect

---

[1]    This case was brought by health care providers, rather than by any woman whose decision to abort might have been affected by the state law at issue. Thus, while the record contains unspecific claims of AHCCCS denials of requests to pay for abortions, no claims of improper denial have been brought before the courts of this State and there are no concrete facts for adjudication presented in this case. I also note that the statute at issue was passed in 1980 and wonder why the nineteen-year delay in bringing suit.

[2]    *See Valley Nat'l Bank v. Glover*, 62 Ariz. 538, 554, 159 P.2d 292, 299 (1945) (observing that state and federal equal protection clauses "have for all practical purposes the same effect"); *Martin v. Reinstein*, 195 Ariz. 293, 313, ¶ 62, 987 P.2d 779, 799 (App. 1999) (finding "no difference in underlying rationale that would militate in favor of interpreting the Arizona Equal Privileges and Immunities Clause differently from its federal counterpart"); *see also State v. Melendez,* 172 Ariz. 68, 71, 834 P.2d 154, 157 (1992) ("The touchstone of due process under both the Arizona and federal constitutions is fundamental fairness."); *Martin,* 195 Ariz. at 316, ¶ 76, 987 P.2d at 802 (finding "no support for the proposition that the Arizona Constitution provides greater [due process] protection than the United States Constitution").

the life of the mother and in cases of rape or incest, did not violate any federal constitutional right. It concluded that a woman's right to choose to undergo an abortion "did not translate into a [federal] constitutional obligation of [the State] to subsidize abortions." *Id.* at 315. The Court distinguished "between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy," noting that "[c]onstitutional concerns are greatest when the State attempts to impose its will by force of law; the State's power to *encourage* actions deemed to be in the public interest is necessarily far broader." *Maher v. Roe*, 432 U.S. 464, 475-76 (1977) (emphasis added). Thus, the federal constitution requires that while a state may not interfere with a woman's right to choose to have an abortion, it need not fund abortions.

¶48        The Court reasoned as follows in upholding a funding prohibition similar to Arizona's:

> [I]t simply does not follow that a woman's freedom of choice carries with it a constitutional entitlement to the financial resources to avail herself of the full range of protected choices. The reason why was explained in *Maher* [*v. Roe*, 432 U.S. 464 (1977)]: although government may not place obstacles in the path of a woman's exercise of her freedom of choice, it need not remove those not of its own creation. Indigency falls in the latter category. The financial constraints that restrict an indigent woman's ability to enjoy the full range of constitutionally protected freedom of choice are the product not of governmental restrictions on access to abortions, but rather of her indigency. Although Congress has opted to subsidize medically necessary services generally, but not certain medically necessary abortions, the fact remains that the Hyde Amendment leaves an indigent woman with at least the same range of choice in deciding whether to obtain a medically necessary abortion as she would have had if Congress had chosen to subsidize no health care costs at all. We are thus not persuaded that the Hyde Amendment impinges on the constitutionally protected freedom of choice recognized in *Wade*.

> Although the liberty protected by the Due Process Clause affords protection against unwarranted government interference with freedom of choice in the context of certain personal decisions, it does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom. To hold otherwise would mark a drastic change in our understanding of the Constitution. It cannot be that because government may not prohibit the use of contraceptives, *Griswold v. Connecticut*, 381 U.S. 479, or prevent parents from sending their child to a private school, *Pierce v. Society of Sisters*, 268 U.S. 510, government, therefore, has an affirmative constitutional obligation to ensure that all persons have the financial resources to obtain contraceptives or send their children to private schools. To translate the limitation on governmental power implicit in the Due Process Clause into an affirmative funding obligation

20

would require Congress to subsidize the medically necessary abortion of an indigent woman even if Congress had not enacted a Medicaid program to subsidize other medically necessary services. Nothing in the Due Process Clause supports such an extraordinary result. Whether freedom of choice that is constitutionally protected warrants federal subsidization is a question for Congress to answer, not a matter of constitutional entitlement. Accordingly, we conclude that the Hyde Amendment does not impinge on the due process liberty recognized in *Wade*.

*Harris*, 484 U.S. at 316-18 (footnotes omitted).[3]

**¶49**      The United States Supreme Court has also analyzed whether the constitutional right to choose entitled women to Medicaid payments for abortions that were not medically necessary. *Maher*, 432 U.S. at 464. In holding that it did not, the Court explained that the abortion right recognized in *Roe v. Wade* and its progeny did not prevent the State from making a "value judgment favoring childbirth over abortion, and . . . implement[ing] that judgment by the allocation of public funds." 432 U.S. at 474. The Court reasoned that

> [t]he Connecticut regulation places no obstacles – absolute or otherwise – in the pregnant woman's path to an abortion. An indigent woman who desires an abortion suffers no disadvantage as a consequence of Connecticut's decision to fund childbirth; she continues as before to be dependent on private sources for the service she desires. The State may have made childbirth a more attractive alternative, thereby influencing the woman's decision, but it has imposed no restriction on access to abortions that was not already there. The indigency that may make it difficult – and in some cases, perhaps, impossible – for some women to have abortions is neither created nor in any way affected by the Connecticut regulation.

*Id.*

**¶50**      In sum, the Supreme Court has concluded that (1) neither the Due Process Clause nor the Equal Protection Clause requires states to fund abortions, and (2) whether to do so is a policy choice appropriately left to the states. Therefore, if there is to be any state payment for therapeutic abortions for indigent women in Arizona, the right to such payment must derive from the vote of the Arizona legislature or be compelled by the constitution of this State. The Arizona legislature has chosen not

---

[3]      The majority finds it "difficult to reconcile [*Harris*] with the basic teaching of *Roe v. Wade*." *Supra* n.3. Yet *Harris* was decided seven years after *Roe* and while the Supreme Court has continued to decide abortion cases, it has not overruled or questioned the holdings of *Harris* or *Maher*.

to fund abortions that are not necessary to save the life of the mother, *see* A.R.S. § 35-196.02, leaving for decision only whether the Arizona Constitution requires payment for medically necessary abortions.

¶51        The majority concludes that it does.  That obligation, according to the majority, emanates from a  fundamental duty under the Equal Privileges and Immunities Clause to have the State act in a neutral manner with respect to providing medical treatment. *See id.* ¶ 14.  Yet despite the acknowledged fundamental nature of the federal right to choose, the Supreme Court scrutinized statutes affecting abortion funding only to determine whether they had a rational basis, finding the classifications at issue in such an analysis – gender and wealth – not suspect categories.  *See Harris*, 448 U.S. at 322-23; *Maher*, 432 U.S. at 470.  This court, however, has chosen to apply the strict scrutiny test to this funding decision. Construing Arizona's Privileges and Immunities Clause in a manner at odds with the traditional analysis, which has always been to interpret "the equal protection clauses of the Fourteenth Amendment and the state constitution" in similar fashion, constitutes a dramatic departure from prior Arizona case law. *See Glover*, 62 Ariz. at 554, 159 P.2d at 299; *Martin*, 195 Ariz. at 313, ¶ 62, 987 P.2d at 799.  Calling the right to neutral funding fundamental,  the majority of necessity applies the strict scrutiny test, which precipitates the finding of unconstitutionality.  To narrow the question to the *funding of abortion*, as the Supreme Court has done, reveals that the pivotal question – funding, not choice – has never been defined as fundamental and therefore the applicable standard of review is not strict scrutiny, but rather the rational basis standard.  The statute meets that standard.

¶52        The Arizona legislature has the power to enact policy and funding laws for the general welfare. *See McKinley v. Reilly*, 96 Ariz. 176, 179, 393 P.2d 268, 270 (1964); *State v. Harold*, 74 Ariz. 210, 216, 246 P.2d 178, 181 (1952).  This power encompasses the right to draw lines regarding funding. We must therefore presume that the legislature has determined that the public's safety, health, or moral well being is best served by not prohibiting or restricting – but not funding – abortions unless necessary to save the life of the mother.[4]  This is the type of policy choice routinely entrusted to the legislature

[4]        On the limited record before us, we cannot know whether the AHCCCS program  contains other exceptions to funding of which we are now unaware, such as limiting care of potentially non-eligible

22

and, unless the choice is unlawful or unconstitutional, our jurisprudence and notions of separation of powers require that we defer to the legislature's choice. *See Republic Inv. Fund I*, 166 Ariz. at 147-48, 800 P.2d at 1255-56; *Harold*, 74 Ariz. at 216, 246 P.2d at 181. If the public disagrees with the choices of its elected representatives, its recourse is to turn those representatives out of office. It is not for this court to make such policy decisions.

**¶53**          In enacting A.R.S. § 35-196.02, the legislature was undoubtedly aware of the Supreme Court's holding that a woman has a fundamental right in the first trimester of pregnancy to choose to abort a fetus, *Roe v. Wade*, 410 U.S. at 113, unhampered by "interference from the State." *Planned Parenthood of Central Mo. v. Danforth*, 428 U.S. 52, 61 (1976) (citing *Roe v. Wade*, 410 U.S. at 164). It was probably also aware that the Court had recognized, in this contentious policy area, the State's "important and legitimate interest in . . . the potentiality of human life," *Planned Parenthood v. Casey*, 505 U.S. 833, 875-76 (1992) (quoting *Roe v. Wade*, 410 U.S. at 462), at all stages of development. *Id.* at 876 (O'Connor, Kennedy, and Souter, JJ.); 944 (Rehnquist, C.J., joined by White, Scalia, and Thomas, JJ., concurring in the judgment in part and dissenting in part). This court's analysis minimizes the State's interest in potential human life and ignores the fact that abortion differs in a profound way from other kinds of medical treatment. In no other "treatment" is a potential life terminated. Thus, the State has a heightened interest in protecting life that the majority dismisses too lightly.[5]

---

individuals to "emergency care," or precluding experimental, risky, or greatly expensive procedures. The newly discovered fundamental right to have the State fund chosen medical procedures in a neutral manner through AHCCCS may well call these exceptions into question and require funding for greatly expanded medical care for indigent Arizonans.

[5]          The majority criticizes the legislature for acting inconsistently in protecting fetal life because it allows payment for abortions to terminate pregnancies resulting from rape or incest. Op. at ¶ 24. The record reflects, however, that the rape and incest exception is embodied in an administrative definition of "medical necessity." It is not found in A.R.S. § 35-196.02. While that exception may be necessary to comply with requirements for federal reimbursement, it appears to violate Arizona law. *See* Pub. Law 106-554, §§ 508-09, 3 USCCAN (2000) at Stat. 2763A-70 (requiring states to provide the benefits authorized by federal law in order to qualify for federal funds). *But cf.* A.R.S. § 35-196.02 (allowing state funding of abortions only to save the life of the mother); *KAET v. Ariz. State Pers. Bd.*, 195 Ariz. 173, 175, ¶ 9, 985 P.2d 1032, 1034 (1999) (holding that agency powers are limited by the agency's enabling legislation; agency rule that conflicts with a statute must yield).

¶54        I have a final concern: Generally, when a court finds a statute unconstitutional, it strikes the offending provision, clause, or word. In this case, however, the court has taken the liberty of simply rewriting the statute, substituting the word "health" for the legislature's chosen term, "life." This court has cautioned others against construing "the words of a statute to mean something other than what they plainly state." *Canon School Dist. No. 50 v. W.E.S. Constr. Co.*, 177 Ariz. 526, 529, 869 P.2d 500, 503 (1994). We should follow our own admonition. "Life" is plainly stated and has an ascertainable meaning, one that differs from "health." This court has also previously warned that "[i]t is only where there is no doubt as to the intention of those who frame [a] . . . statute that a court may modify, alter or supply words that will . . . permit 'particular provisions' to be read or construed otherwise than 'according to their literal meaning.'" *Id.* (quoting *Bd. of Supervisors v. Pratt*, 47 Ariz. 536, 542-43, 57 P.2d 1220, 1233 (1936) (citations omitted)). That is not the case here. The alteration by this court amends the statute to mean something clearly not intended by the legislature.

¶55        In sum, I see nothing in the Arizona Constitution that provides greater protection for a woman's right to choose abortion than is provided by the federal constitution, nor do I see any provision compelling payment for the procedure. Whatever one may think of the merits of the statute at issue, it embodies the type of policy choice that is routinely entrusted to the legislature, an elected body, to make. It is not the province of the court to substitute its judgment for that of the public's elected representatives.

¶56        I would affirm the judgment of the court of appeals.

_____
REBECCA WHITE BERCH, Justice


CONCURRING:


_____
CHARLES E. JONES, Chief Justice

24